IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,  )
                           )
        Plaintiff,         )      CR. NO.16-cr-162
                           )
    vs.                    )
                           )
YUSUF ABDIRIZAK WEHELIE,   )
                           )
        Defendant.         )
_____)


MOTIONS HEARING

July 13, 2016


---


BEFORE:      THE HONORABLE IVAN D. DAVIS
             UNITED STATES MAGISTRATE JUDGE


APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                    BY: BRANDON L. VAN GRACK, ESQ.




FOR THE DEFENDANT:  OFFICE OF THE FEDERAL PUBLIC DEFENDER
                    BY: CADENCE MERTZ, ESQ.




---

OFFICIAL COURT REPORTER: RENECIA A. WILSON, RMR,CRR
                         U.S. District Court
                         401 Courthouse Square
                         Alexandria, VA  22314
                         (703)501-1580

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT |
|---|---|---|---|
| R. Gaylord | 4 | 17 | 32 |
| CLOSING BY GOVERNMENT | | 35 | |
| CLOSING BY DEFENSE | | 38 | |
| COURT'S RULING | | 41 | |

1        (Thereupon, the following was heard in open

2   court at 2:36 p.m.)

3        THE CLERK:  United States of America versus

4   Yusuf Abdirizak Wehelie.  Case 16-MG-302.

5        MR. VAN GRACK:  Good afternoon, Your Honor,

6   Brandon Van Grack and John Gibbs on behalf of the United

7   States.

8        THE COURT:  Good afternoon.

9        MS. MERTZ:  Good afternoon, Your Honor.

10   Cadence Mertz or behalf of Mr. Wehelie.

11        THE COURT:  Good afternoon.

12        The matter before is the Court on a joint

13   preliminary detention hearing.  Are the parties ready to

14   proceed?

15        MS. MERTZ:  Yes, Your Honor.

16        MR. VAN GRACK:  Yes, Your Honor.  An

17   indictment was obtained earlier today and so I believe

18   the only matter before the Court is a detention hearing,

19   and the government is, in fact, seeking detention.

20        MS. MERTZ:  Your Honor, for the record we've

21   not been informed of that indictment and I have not seen

22   it.

23        THE COURT:  Both parties received a copy of

24   the Pretrial Services report in this matter?

25        MR. VAN GRACK:  Yes, we have, Your Honor.

R. Gaylord - Direct                                      4

1          MS. MERTZ:  Yes, Your Honor.

2          THE COURT:  Does either party dispute the

3   accuracy of the information that's contained in that

4   report?

5          MS. MERTZ:  No, Your Honor.

6          MR. VAN GRACK:  We do not, Your Honor.

7          THE COURT:  The Court will adopt as factually

8   accurate the information contained in the Pretrial

9   Services report.

10          Is the government relying on the Pretrial

11   Services report or you would like to call a witness or

12   introduce any further information?

13          MR. VAN GRACK:  Yes, Your Honor, we're

14   relying on the report.  In addition we will be calling a

15   witness.

16          THE COURT:  You may proceed.

17          MR. VAN GRACK:  At this time the government

18   will call Special Agent Richard Gaylord.

19          THEREUPON, RICHARD GAYLORD, having been duly

20   sworn, testified as follows:

21          THE WITNESS:  I do.

22          THE CLERK:  You may be seated.

23          DIRECT EXAMINATION

24   BY MR. VAN GRACK:

25   Q.  Would you please state your name and spell your

1    last name for the record.

2        A.    My name is Richard Gaylord, G-A-Y-L-O-R-D.

3        Q.    And where are you currently employed?

4        A.    I'm employed at the FBI Washington Field Office.

5        Q.    And what is your current title?

6        A.    I'm a special agent.

7        Q.    And how long have you been a special agent?

8        A.    For 12 years.

9        Q.    And, which squad do you serve in at the Washington

10   Field Office?

11       A.    I currently serve on CT 5.

12       Q.    And what does CT stand for?

13       A.    CT stands for counterterrorism.

14       Q.    And how long have you served in the

15   counterterrorism squad?

16       A.    I've been on that squad for two years.

17       Q.    And can you briefly describe your duties with the

18   counterterrorism squad.

19            MS. MERTZ:  Your Honor, we would stipulate to

20   his expertise.

21            THE COURT:  So stipulated.

22   BY MR. VAN GRACK:

23       Q.    Special Agent Gaylord, are you familiar with the

24   facts of this case?

25       A.    I am.

1    Q.   What is the basis for your familiarity?

2    A.   I'm the case agent for the investigation.  I have

3    spoken to other agents who have worked on the

4    investigation.  I have spoken to undercover law

5    enforcement officers who have participated in the

6    investigation.  I've reviewed the evidence, and I've

7    listened to recordings made during the investigations.

8    Q.   Special Agent Gaylord, if you wouldn't mind

9    speaking up.

10   A.   Yes, sir.

11   Q.   Thank you.

12        Do you see the defendant in court today?

13   A.   I do.

14   Q.   Can you please describe what he is wearing and

15   what he is sitting -- and where he is sitting?

16   A.   He's sitting at the table to my left in a green

17   jumpsuit.

18             MR. VAN GRACK:  May the record reflect that

19   the witness has identified the defendant.

20             THE COURT:  The record will so reflect.

21   BY MR. VAN GRACK:

22   Q.   As part of your investigation, did you prepare an

23   affidavit in support of the criminal complaint in this

24   case?

25   A.   I did.

R. Gaylord - Direct                                    7

1     Q.   At this time, I'm showing you what has been marked

2   as Government's Exhibit 1.  Do you recognize that

3   document?

4     A.   I do.

5     Q.   And what is that document?

6     A.   That is the affidavit in support of a criminal

7   complaint and arrest warrant.

8     Q.   I'd ask you to turn to page six of Government's

9   Exhibit 1.  Is there a signature on that page?

10    A.   Yes, there is.

11    Q.   Is that your signature?

12    A.   It is.

13    Q.   Is the information contained in Government's

14   Exhibit 1 a true and accurate reflection of the facts as

15   you know them when the affidavit was executed?

16    A.   It is.

17    Q.   At this time, Your Honor, the government would

18   move Government's Exhibit 1 into evidence.

19             MS. MERTZ:  No objection, Your Honor.

20             THE COURT:  So admitted.

21   BY MR. VAN GRACK:

22    Q.   Are you aware of the citizenship for the

23   defendant?

24    A.   I am.

25    Q.   And what is his citizenship?

1    A.    He is a United States citizen.

2    Q.    And where was he born?

3    A.    He was born in the United States, Virginia.

4    Q.    And his age?

5    A.    He's 25.

6    Q.    At any attempt -- at any point in your

7    investigation, did the defendant attempt to obtain a

8    firearm?

9    A.    He did.

10    Q.    When?

11    A.    In January of this year.

12    Q.    And who did he attempt to acquire the firearm

13    from?

14    A.    In conversations with one of our undercover law

15    enforcement officers, he requested assistance in

16    obtaining a firearm.

17    Q.    And can you describe what occurred in that

18    attempt?

19    A.    In that attempt, he asked our undercover law

20    enforcement officer if he would help Mr. Wehelie in

21    getting a firearm for himself and his cousin.

22    Q.    And, did the defendant indicate why he wanted his

23    cousin to obtain a firearm?

24    A.    Because his cousin does not have a felon

25    conviction and would be able to maintain the firearm.

1    Q.  And did the defendant indicate in that

2  communication with the undercover law enforcement officer

3  that, in fact, that weapon would be for both him and his

4  cousin?

5          MS. MERTZ:  Your Honor, objection, leading.

6          MR. VAN GRACK:  Your Honor, I'll rephrase.

7  BY MR. VAN GRACK:

8    Q.  Special Agent Gaylord, was this conversation

9  between the defendant and the undercover law enforcement

10  officer recorded?

11    A.  It was.

12    Q.  Have you listened to that recording?

13    A.  I have.

14    Q.  What statements did the defendant make about that

15  gun?

16    A.  The defendant said it would definitely be for both

17  of us.

18    Q.  Did, in fact, the undercover law enforcement

19  officer obtain a weapon for the cousin?

20    A.  He did --

21          MS. MERTZ:  Your Honor, again, objection,

22  leading.

23          THE COURT:  Overruled.

24          THE WITNESS:  He did not.

25  BY MR. VAN GRACK:

1    Q.  At any point in your investigation, did you learn

2    whether the defendant in fact fired a weapon?

3    A.  I did.

4    Q.  Can you describe the circumstances under which you

5    learned that?

6              MS. MERTZ:  Objection, Your Honor, relevance.

7              MR. VAN GRACK:  Your Honor, there's --

8              THE COURT:  Detention hearing.  He fired a

9    weapon.  That could be -- Court could reasonably infer he

10   could be dangerous.

11             Overruled.

12             THE WITNESS:  The defendant said he had fired

13   an AK-47 while he was in Yemen.

14   BY MR. VAN GRACK:

15   Q.  At any point in your investigation did you learn

16   whether the defendant, in fact, possessed a firearm?

17   A.  He did.

18   Q.  And, can you describe how he became -- came into

19   possession of that firearm?

20   A.  During a conversation with the undercover law

21   enforcement officer, the defendant was asked if he would

22   transport the weapons on behalf of the undercover.

23   Q.  And when did that conversation occur?

24   A.  January of 2016.

25   Q.  And was this conversation recorded?

1    A.   It was.

2    Q.   Have you listened to that conversation?

3    A.   I have.

4    Q.   And what were the firearms that were involved in

5    that offer?

6    A.   The firearms were four Cobray Mac-11 machine guns.

7    Q.   And, what is the -- are you aware of the

8    capabilities of the Mac-11?

9    A.   Yes, they're capable of firing up to 1200 rounds

10   per minute.

11   Q.   And, does the Mac-11 go by another name or have

12   some sort of slang term associated with it?

13   A.   They're multiple.  It is a machine gun.

14   Q.   And did, in fact, the defendant accept the

15   undercover law enforcement officer to transport those

16   firearms?

17   A.   He did.

18   Q.   And can you describe the circumstances under which

19   he transported those firearms?

20   A.   In February of 2016, the defendant traveled to

21   Baltimore, Maryland, and met with a second undercover law

22   enforcement officer.  At that time he was given the four

23   Cobray Mac-11s, and then he placed them in a bag,

24   concealed them with additional towels and purses to

25   further hide what would be in the bag and then loaded

1    them into his vehicle and drove down to Fairfax County,

2    Virginia.

3         Q.   And, was that interaction in the Baltimore hotel

4    room recorded?

5         A.   It was.

6         Q.   Have you listened to that recording?

7         A.   I have.

8         Q.   And what occurred after the defendant arrived in

9    Virginia?

10        A.   He provided the weapons to another undercover law

11   enforcement officer in the parking lot in Fairfax County,

12   Virginia.

13        Q.   And was that interaction recorded?

14        A.   It was.

15        Q.   And have you listened to that recording?

16        A.   I have.

17        Q.   Was the defendant paid anything for this

18   transaction?

19        A.   He was paid $300.

20        Q.   You mentioned multiple undercover law enforcement

21   officers.  At what point did the defendant first interact

22   with the law enforcement officers -- undercover law

23   enforcement officer?

24        A.   He first met the undercover law enforcement

25   officer in December of 2015.

1    Q.   And this is the undercover officer who he

2    attempted to obtain a gun for his cousin?

3    A.   Correct.

4    Q.   Did they engage in communications beyond December

5    of 2010?

6    A.   They did.

7    Q.   And what were the topics of those conversations?

8    A.   They discussed illegal activity as well as jihad.

9    Q.   And what -- were those conversations recorded?

10   A.   They were.

11   Q.   Have you listened to those conversations?

12   A.   I have.

13   Q.   What did the defendant say about jihad?

14   A.   The defendant said he loved jihad and had spoken

15   about it with others.

16   Q.   Did at any point -- did defendant specifically

17   talk to the undercover law enforcement officer about

18   engaging in jihad?

19   A.   He did.  He spoke to the undercover about

20   potentially providing more materials to the quote,

21   unquote brothers overseas and then the defendant asked

22   the undercover if he would help him in traveling.

23   Q.   At any point in their conversation, was -- were

24   terrorist groups discussed?

25   A.   They were.

1      Q.   Which groups were discussed?

2      A.   ISIS, otherwise referred to as ISIL.

3      Q.   And what does ISIS stand for?

4      A.   ISIL stands for the Islamic state and the Levant.

5      Q.   And what did the defendant say about ISIL or ISIS?

6      A.   He -- when he first heard from the undercover that

7  they were talking about ISIS, he became visibly excited

8  and shed a tear.

9      Q.   Did the defendant say anything else about ISIL?

10     A.   He was very supportive.  He said he liked that

11  they would kill hundreds of people and be proud of it.

12     Q.   Did the defendant indicate when he first developed

13  his feelings for ISIL?

14     A.   Yes, he said he started following ISIL in 2012.

15     Q.   And did the defendant discuss whether he

16  associated people who are supporters of ISIL?

17     A.   He did.  He had spoken with others who he said

18  were down.

19     Q.   And, all of these conversations with respect to

20  ISIL, were these conversations recorded?

21     A.   They were.

22     Q.   Have you listened to those recordings?

23     A.   I have.

24     Q.   At any point did the defendant discuss violence

25  associated with ISIL?

1    A.   He has.

2    Q.   And what did the defendant say about violence in

3  ISIL?

4    A.   In addition to being proud that they killed one

5  hundred people, the defendant was watching a video with

6  one of the undercovers.   In the recording you could hear

7  the undercover say that the person snapped his neck, and

8  the defendant laughed and said, yes.

9    Q.   And was this interaction recorded?

10   A.   It was.

11   Q.   Have you listened to that recording?

12   A.   I have.

13   Q.   And the undercover law enforcement officer, is

14  that the original law enforcement officer that you

15  discussed from December, 2015?

16   A.   Correct.

17   Q.   At any point did the defendant discuss providing

18  support for ISIL?

19   A.   Yes.

20   Q.   And what did the defendant discuss in terms of

21  that support?

22   A.   The defendant asked the undercover if at some

23  point when quote, unquote, the time is right, he would

24  help him to travel.

25   Q.   Did the defendant make any other comments about

1    traveling to ISIL?

2       A.   He did.  He had said that he would -- he desired

3    to travel to Libya, first Tunisia and then ultimately

4    Libya.

5       Q.   And did the defendant indicate why he wanted to

6    travel to Libya and Tunisia to join ISIL?

7       A.   The defendant thought he would fit in more there

8    in that the government, the U.S. Government would not be

9    watching that area as closely as say the Middle East.

10      Q.   Why did the defendant believe or state that he

11   believed he would be better able to fit in Libya and

12   Tunisia?

13      A.   He said it was because he was black.

14      Q.   At any point did the defendant indicate what would

15   happen if he was unable to travel to Libya to join ISIL?

16      A.   Yes.

17      Q.   And what did the defendant say he would do if he

18   was unable to travel to Libya?

19      A.   In conversations with the undercover law

20   enforcement there is a plan laid out of potentially

21   traveling by boat and if not by boat, by plane.  And then

22   the defendant said if he could not leave, he would

23   potentially conduct an attack here in the U.S.

24      Q.   Did the defendant discuss what kind of attack

25   would occur in the United States?

1    A.   He did.

2    Q.   And what did the defendant say about that attack?

3    A.   He said he would attack a military recruiting

4    station.

5    Q.   And did he discuss the specifics as to how he

6    would attack a military recruiting station?

7    A.   He did.  He stated that he would first go in and

8    pretend to enlist in the military so that they would

9    become more comfortable with them and then he would go

10   back in and shoot up the place.

11   Q.   Did the defendant indicate that there were other

12   means in which he would kill members of the military at

13   the recruiting station?

14   A.   He mentioned potentially getting explosives.

15   Q.   Was that conversation that you just relayed

16   recorded?

17   A.   It was.

18   Q.   Have you listened to that conversation?

19   A.   I have.

20        MR. VAN GRACK:  Your Honor, at this time, we

21   have no more questions for Special Agent Gaylord.

22        THE COURT:  Cross-examination.

23        MS. MERTZ:  Thank you, Your Honor.

24             CROSS-EXAMINATION

25   BY MS. MERTZ:

1    Q.    Agent Gaylord, you mentioned that the first

2   contact with your agent and Mr. Wehelie was in December

3   of 2015, correct?

4    A.    Correct.

5    Q.    How did that contact come about?

6    A.    That had come about while Mr. Wehelie with

7   somebody else in the meeting and doing some potential

8   illegal activity.

9    Q.    What illegal activity?

10    A.    Moving cigarettes from -- untaxed cigarettes from

11   Virginia to Maryland.

12    Q.    And the undercover agent was involved in the

13   moving of cigarettes?

14    A.    He was not involved in that, no.

15    Q.    He met Mr. Wehelie during that incident?

16    A.    Yes.

17    Q.    And did he befriend Mr. Wehelie?

18    A.    He did.

19    Q.    He continued the contact with Mr. Wehelie?

20    A.    He did.

21    Q.    He did that intentionally?

22    A.    He did.

23    Q.    And, did he continue to call Mr. Wehelie on his

24   phone?

25    A.    He did.

1    Q.   And he continued to text message with him?

2    A.   Yes.

3    Q.   And reach out to him maybe on Facebook?

4    A.   I'm not sure if it was on Facebook, but he did

5    continue to reach out.

6    Q.   About how often would you reach out to Mr.

7    Wehelie?

8    A.   I cannot say.

9    Q.   Were other agents reaching out to Mr. Wehelie as

10   well?

11   A.   I don't believe so.

12   Q.   And this contact went on for approximately two

13   months, based on the timeline in your affidavit; is that

14   correct?

15   A.   Correct.

16   Q.   And after Mr. Wehelie delivered the guns from one

17   agent to another agent in February of 2016, did the FBI

18   arrest him?

19   A.   They did not.

20   Q.   And that was five months ago, correct?

21   A.   Correct.

22   Q.   Did the agent make any attempt to ascertain Mr.

23   Wehelie's state of mind before he attempted to befriend

24   him and contacted him on a regular basis?

25   A.   He did not.

1    Q.   Did he make any attempt to determine whether or

2    not Mr. Wehelie was suffering from any kind of mental

3    illness at that time?

4    A.   He did not.

5    Q.   Whether or not he had any kind of substance abuse

6    addictions?

7    A.   He did not.

8    Q.   He didn't make any attempt to determine whether or

9    not Mr. Wehelie was in a fragile state of mind?

10   A.   No.

11   Q.   Did he attempt to ascertain whether or not Mr.

12   Wehelie was struggling for money?

13   A.   No.

14   Q.   But he did offer to pay Mr. Wehelie money at

15   times?

16   A.   He did.

17   Q.   And on how many occasions did he offer to pay Mr.

18   Wehelie money?

19   A.   I believe he paid him once in cash for the drugs

20   and then he provided him a phone.

21   Q.   I'm sorry.  What was the last part?

22   A.   He provided him a telephone.

23   Q.   So, there were two instances on which the agent

24   paid Mr. Wehelie, apart from the gun incident; is that

25   right?

1    A.   No, that was the gun incident.

2    Q.   I'm sorry.

3    A.   The $300, the first payment, was for that.

4    Q.   And then he -- the agent also paid Mr. Wehelie for

5    drugs and for a phone?

6    A.   Drugs?

7    Q.   I'm sorry.  Did you --

8    A.   No.

9    Q.   Let me back up.  How many occasions did the agent

10   pay Mr. Wehelie money?

11   A.   He paid him twice.

12   Q.   And one was for the guns and one was for a phone?

13   A.   One was with a phone.  It was -- there was no cash

14   with a phone.  He provided him a phone instead of cash.

15   Q.   What was the first instance of payment about?

16   A.   It was about the guns.

17   Q.   How much money did he pay Mr. Wehelie?

18   A.   $300.

19   Q.   And when was that?

20   A.   That was -- February 23rd.

21   Q.   And what was the other instance of payment, what

22   date?

23   A.   That was -- I don't recall the exact date of that

24   payment.  That was when he was provided a cellular

25   telephone.

1    Q.   And was that February of 2016?

2    A.   I don't believe so.

3    Q.   January?

4    A.   I believe it was January.

5    Q.   January of 2016 he paid Mr. Wehelie money?

6    A.   He provided him a cellular telephone.

7    Q.   He did not pay him any cash?

8    A.   No.

9    Q.   What kind of phone did he provide him?

10   A.   Um, I believe it was a Samson Galaxy.

11   Q.   Was it new?

12   A.   It was.

13   Q.   What's the approximate phone value of that phone?

14   A.   I believe it may be around $600.

15   Q.   On the first instance when the agent met Mr.

16   Wehelie, was anybody else present?

17   A.   Yes.

18   Q.   Who else was present?

19   A.   There were multiple others present.

20   Q.   Could you identify them, please.

21        MR. VAN GRACK:  Your Honor, we would object

22   to the relevance of the other individuals involved in

23   that meeting.  There are other national security law

24   enforcement sensitivities here and question its relevance

25   in terms of conversation that was recorded and whether

1   the agent actually relayed the contents of those

2   recordings.

3          MS. MERTZ:  Your Honor, I have two responses.

4   One is the government opened the door to this line of

5   questioning by going into great delay on these alleged

6   recorded phone calls and who said what.  And, these are

7   phone -- these are phone calls and meetings of multiple

8   individuals present, and it is relevant to detention

9   whether or not Mr. Wehelie was agreeing with what other

10  people were saying or whether or not -- and other people

11  were instigating the conversation.

12         THE COURT:  How do you -- why do you need to

13  know who those other people were to determine that answer

14  to that question?

15         MS. MERTZ:  Fair enough, Your Honor.  I'll

16  move on.

17  BY MS. MERTZ:

18     Q.  So, there were multiple other people present?

19     A.  Yes.

20     Q.  Were they all FBI agents?

21     A.  No.

22     Q.  Were some of them confidential informants?

23     A.  They were not confidential informants of the FBI.

24     Q.  And, where did that first meeting take place?

25     A.  In Fairfax County, Virginia.

1    Q.   Where, specifically?

2    A.   At a storage location.

3    Q.   Whose storage location?

4    A.   I do not know.

5    Q.   Was that meeting set up at the behest of the FBI?

6    A.   It was.

7    Q.   What was the purpose of that meeting?

8    A.   To introduce an undercover employee to Mr.

9    Wehelie.

10   Q.   And yet this was the FBI's first meeting with him?

11   A.   Yes.

12   Q.   So, you knew you were targeting Mr. Wehelie?

13   A.   Yes.

14   Q.   Was that -- and was that first meeting recorded on

15   December 10th?

16   A.   I do not -- I believe it was, but I know we have

17   the statement of the undercover employee.

18   Q.   And the other people present were civilians?

19   A.   There were other law enforcement.

20   Q.   In paragraph 7A of your affidavit, you make a

21   reference to something called a notional scenario.  Is

22   that another term for hypothetical?

23   A.   Yes.

24   Q.   So, that paragraph describes a series of facts

25   that were posed by the FBI agent hypothetically?

1       A.   Yes.

2       Q.   In a conversation with Mr. Wehelie?

3       A.   Correct.

4       Q.   And none of those facts actually ever occurred?

5       A.   No, it did not.

6       Q.   Did the FBI make any effort to determine whether

7    or not Mr. Wehelie was telling the truth when he said

8    he'd fired a weapon before?

9       A.   We did not.  There did not seem to be any way to

10   actually verify whether on his time in a foreign country

11   we could or could not tell if he fired a weapon.

12      Q.   Did the FBI make any effort to ascertain whether

13   or not Mr. Wehelie had ever possessed a weapon before?

14      A.   Again, we could not verify that time.  However, we

15   did verify that he was in Yemen at the time when he

16   stated.

17      Q.   And he has family in Yemen, that's correct, or he

18   had at the time?

19      A.   At the time, yes.

20      Q.   His brother, in fact?

21      A.   Correct.

22      Q.   And that December 22nd conversation, how is that

23   recorded?

24      A.   Digitally, with a digital recorder.

25      Q.   Is -- and you make reference to this term "whole

1  K".  Can K be used as slang for other things on the

2  street?

3      A.  I can't say exactly what K could or could not be

4  used for.

5      Q.  You've never heard it used as a term for special

6  K, a drug?

7      A.  I have heard that.

8      Q.  And have you ever heard it used as a term for

9  kilo, such as a quantity of drugs?

10      A.  I have.

11      Q.  So, it could be a slang for something other than a

12  gun?

13      A.  However, Mr. Wehelie used it in the terms of

14  attacking military location, he said, "get a whole K

15  fully loaded".

16      Q.  And, that again, is in the context of a

17  hypothetical scenario posed by the FBI agent?

18      A.  No, that was in Mr. Wehelie's hypothetical of what

19  would happen if he could not travel.

20      Q.  And, in paragraph 7B, you refer to this

21  conversation on January 21st.  How is that phone

22  conversation recorded?

23      A.  We have audio and video.

24      Q.  And, I'm sorry.  Was that an in-person meeting or

25  a telephone?

A.   The 21st was in person.

Q.   Were other people present?

A.   Ah, yes.

Q.   How many other people were present?

A.   One person joined them briefly.

Q.   I'm sorry.

A.   One person joined them briefly.

Q.   Was that person law enforcement?

A.   He was.

Q.   And, in that conversation, did Mr. Wehelie make any monetary offer to purchase a weapon?

A.   I do not recall him making an offer to purchase one.  He inquired how much one would cost.

Q.   But he did not offer to pay a certain amount to buy one?

A.   No.

Q.   And, there's nothing in your affidavit about any follow-up conversation about him purchasing his own weapon?

A.   Correct.

Q.   And, there was no conversation future -- further conversation about him purchasing a weapon for himself, was there?

A.   For himself, no.

Q.   Returning to the conversation on February 18th,

1    how was that conversation recorded?

2       A.   In audio and visual, audio and video recordings.

3       Q.   And how many people were present at that meeting?

4       A.   Which meeting?

5       Q.   The meeting on February 18th?

6       A.   Which location?

7       Q.   Sorry.  I'll turn your attention to paragraph 8 A.

8       A.   Okay.

9       Q.   And, that appears to be at a hotel in Baltimore,

10   Maryland.

11      A.   Uh-huh.

12      Q.   How many people were present at that meeting in

13   the hotel room?

14      A.   Two.

15      Q.   Besides Mr. Wehelie?

16      A.   No, one besides Mr. Wehelie.

17      Q.   Okay, and that's UCE 2?

18      A.   Correct.

19      Q.   And, who had proposed the idea that Mr. Wehelie

20   transport four guns?

21      A.   UCE 1.

22      Q.   So, it was his idea?

23      A.   Yes.

24      Q.   And the guns involved in paragraph 8A had been

25   rendered inoperable?

1    A.  Yes.

2    Q.  Had the FBI ever fired those guns to ascertain

3    whether or not they were operable?

4    A.  I cannot say whether anybody at the FBI had.  I

5    had not.

6    Q.  So, you don't know if they were ever operable?

7    A.  I do not.

8    Q.  And, after the one FBI agent gave the four guns to

9    Mr. Wehelie, he then drove them to a second FBI agent

10   waiting in Springfield, Virginia; is that correct?

11   A.  He drove them to another undercover law

12   enforcement officer.

13   Q.  Okay.  So, the only transfer that Mr. Wehelie

14   accomplished was from one FBI agent to another FBI agent?

15   A.  Yes.

16   Q.  And, after he delivered the guns, the FBI agent

17   paid him money, correct?

18   A.  On a separate meeting, yes.

19   Q.  On a separate meeting.  But did not arrest him?

20   A.  No.

21   Q.  Did -- you do say in here that you followed --

22   surveilled Mr. Wehelie on his trip from Baltimore to

23   Springfield, correct?

24   A.  Yes.

25   Q.  And, did you follow him or somebody follow him the

1    entire way?

2        A.   Yes.

3        Q.   Did he stop at all?

4        A.   Um, no.

5        Q.   Was anybody else involved in the transfer?

6    Besides Mr. Wehelie, was anybody else with him in the

7    car?

8        A.   No.

9        Q.   And he never trans -- he never switched cars or

10   anything like that?

11       A.   No.

12       Q.   Was anybody -- how many agents were waiting for

13   him in Springfield?

14       A.   He met with one person.

15       Q.   And after that transfer on February 18th, five

16   months ago, did the agent reach out to Mr. Wehelie again?

17       A.   The agent that he dropped him off to, no.

18       Q.   Did the undercover agent number one, as he's

19   referred to in your affidavit, reach out to Mr. Wehelie

20   again?

21       A.   Yes.

22       Q.   How many times would you say he reached out to Mr.

23   Wehelie after that?

24       A.   Um, numerous.

25       Q.   For how long?

1      A.  For several months.

2      Q.  And, after that date, February 18th, Mr. Wehelie

3  did not make any further attempts to purchase firearm; is

4  that right?

5      A.  Ah, correct.

6      Q.  And, there's no record that he's ever purchased a

7  firearm?

8      A.  No.

9      Q.  And other than that occasion and the instance in

10  paragraph 7A in Yemen, there's no evidence he's ever

11  possessed any other firearm, is there?

12      A.  No.

13      Q.  And, your agent searched Mr. Wehelie's family's

14  home last week; is that correct?

15      A.  Yes.

16      Q.  And did they find my firearms?

17      A.  No.

18      Q.  And, in response to the undercover agent's attempt

19  to reach out to Mr. Wehelie after February 18th, would it

20  be fair to say that Mr. Wehelie stopped responding to

21  him?

22      A.  Yes.

23          MS. MERTZ:  Nothing further, Your Honor.

24          THE COURT:  Any redirect?

25          MR. VAN GRACK:  Your Honor, just a few.

REDIRECT EXAMINATION

BY MR. VAN GRACK:

Q.   Just now defense counsel asked whether after February 18th the undercover law enforcement officer, UCE 1 reached out to the defendant.  Do you recall that question?

A.   Yes.

Q.   Did in fact, after February 18th, UCE 1 communicate with the defendant?

A.   Yes.

Q.   And, in those communications, did the defendant and the law enforcement officer have any discussions about ISIL?

A.   Yes.

Q.   In that period of time -- is that the period of time in which the defendant discussed going to a military recruiting center and shooting individuals?

A.   Yes, it was.  That's also the time when he was showing the videos to the undercover.

Q.   And, during that period of time until the day he was arrested, was the defendant under surveillance?

A.   Yes.

Q.   And how would you describe that surveillance?

A.   Constant and daily.

Q.   And, could you tell the Court when was the

1  defendant arrested?

2     A.   July 7th.

3     Q.   And can you tell the Court why the defendant was

4  arrested on July 7th?

5     A.   The defendant was traveling.

6     Q.   Where was the defendant traveling to?

7     A.   To Minneapolis.

8     Q.   And why did the defendant -- why did the FBI

9  decide to arrest the government -- arrest the defendant

10 as he was traveling to Minneapolis?

11    A.   We did not know if this was the first part of any

12 other travel.  We had know idea where his destination

13 was, ultimate destination was.

14            MR. VAN GRACK:  No more questions, Your

15 Honor.

16            MS. MERTZ:  Your Honor, if I may briefly.

17            THE COURT:  They have the obligation, so they

18 get the last word.

19            MS. MERTZ:  Thank you, Your Honor.

20            THE COURT:  Agent Gaylord, if you know --

21            THE WITNESS:  Yes.

22            THE COURT:  -- to the best of your

23 understanding, did Mr. Wehelie -- who did Mr. Wehelie

24 believe he was dealing with when he was dealing with the

25 three undercovers?

1   THE WITNESS:  To the best of my knowledge,

2   based on the recordings and the conversation I overheard,

3   he believed he was dealing with somebody who may

4   potentially help him travel to Syria -- or to Libya and

5   join ISIS.

6   THE COURT:  So you have no information in

7   your possession that would suggest that Mr. Wehelie would

8   believe he was dealing with FBI agents?

9   THE WITNESS:  No, sir.

10  THE COURT:  You have no information in your

11  possession that would suggest that Mr. Wehelie believed

12  when he moved the four firearms or machine guns from

13  undercover two to undercover three, that he had any

14  information in his possession that would suggest that he

15  knew those weapons were inoperable?

16  THE WITNESS:  No.

17  THE COURT:  Thank you.  Does the Court's

18  questions elicit any other questions from counsel?

19  MR. VAN GRACK:  No more questions for the

20  government, Your Honor.

21  MS. MERTZ:  Just one question, Your Honor.

22  BY MS. MERTZ:

23  Q.  Was the -- when Mr. Wehelie transferred the

24  weapons, was that understood to be in connection -- what

25  was the purpose of that purchase to his knowledge?

1     A.   There was no purpose laid out to him.  He was just
2   asked and he agreed.
3     Q.   And it had nothing to do with alleged terrorism or
4   anything like that?
5     A.   No.
6     Q.   Thank you.
7          THE COURT:  Mr. Gaylord, you may step down.
8          (Thereupon, the witness withdrew from the
9   stand.)
10         THE COURT:  Government have anything further?
11         MR. VAN GRACK:  No, we do not, Your Honor.
12         THE COURT:  Government have argument?
13         MR. VAN GRACK:  Yes, Your Honor.  The primary
14  basis for the government's seeking detention is the
15  danger to the community.
16         As the Court just heard from Special Agent
17  Gaylord's testimony, the representations made by the
18  defendant are of the most serious type of danger.  It's
19  an individual who spoke about not just supporting ISIS,
20  not just encouraging others to support ISIS, but actually
21  discussing a plan that he had thought through of
22  traveling to join ISIS as well as a plan that if that
23  travel failed, that he would, in fact, engage in
24  terrorist activity in the United States.  Again, not just
25  a random shooting, but a plan to go to a specific

location, a military recruiting center and how he would
dupe the individuals in that military recruiting center
into thinking that this was someone who was actually
seeking to be recruited.

In this -- the United States would argue this
is the most serious type of danger.  In light of what's
occurred in Orlando, San Bernardino, these are the types
of comments and actions that we must, as a community in
the United States take seriously.

In those instances, there's often comments
and questions about what signs were there, what
indicators did we have as a community that this
individual was going to engage in violence.  And the
United States submits that the testimony from Special
Agent Gaylord indicates that these are the types of
indicators and signs.

This is an individual who sought to obtain a
firearm for himself.  In fact, he sought to obtain it
through another individual to conceal his potential
possession.  That's the cousin that Special Agent Gaylord
referred to earlier.  It's someone who has violated the
law in the past; someone who for $300 was willing to
violate the law again.

In addition to, you have someone who made
statements about supporting ISIL, showed videos, enjoyed,

was brought to tears and emotion when asked whether he
was a supporter of ISIL, and again, relate specific plans
that he had in mind in order to provide support for ISIL.

In addition to the dangerous aspect, the
United States submits that we have a very serious
offense, a ten-year felony in which the evidence is
overwhelming as heard in the testimony and in the
complaint, the evidence are recordings and individuals
who specifically corroborate that the defendant took
possession of the weapons, knew what the weapons were,
and transported them across state lines.

We also have, as relayed in the Pretrial
Services report, indication that he was, in fact, a felon
and had a felony on his record.  And the final point that
the government would raise as relayed in the Pretrial
Services report, you've an individual with a history of
nonappearance for the felony that is identified as
statutory burglary, that he was sentenced to three years
imprisonment suspended, conditioned on good behavior, and
probation.

And the defendant violated that probation as
discussed.  There were four instances in which the
defendant failed to appear in front of the probation
officer.  There's also another instance reported in
that -- in the report in which the individual, the

1    defendant failed to appear in court and I believe there

2    was a bench warrant out for his arrest.

3            And then the final comment the government

4    would make at this time is in the report there is a

5    representation that his family would be willing to host

6    him and watch over him as a condition of release.  And

7    the United States submits that all of the conduct that

8    was just described, not just in the report, but the

9    evidence described in court occurred while the defendant

10   was with his family, either living with his family or

11   near his family or when he was spending significant

12   amount of time with his family.  And so that gives the

13   government no comfort.  It should give the community no

14   comfort that that, in fact, would allow the defendant to

15   meet whatever conditions defense counsel would believe

16   are sufficient.

17            THE COURT:  Thank you.

18            MS. MERTZ:  Thank you, Your Honor.

19   Notwithstanding the government's attempt to portray Mr.

20   Wehelie with or paint him with all of the fervor and

21   furor that's been going on in the country for the last

22   few weeks, Mr. Wehelie is charged with being a felon in

23   possession.  He's not charged with any charges relating

24   to terrorism.

25            Having now had a chance to --

1        THE COURT:  Is it your position this Court is

2   only supposed to consider in making a determination on

3   the safety of the community, the current charges against

4   him?

5        MS. MERTZ:  Absolutely not, Your Honor.

6   However, I would suggest that the weight of some of the

7   government's evidence may be belied by the charge they

8   are bringing in this case.

9        Mr. Wehelie, as the probation officer's

10  report states, was not with his family for the last year.

11  He is now of recently with his family again.

12       He -- Mr. Wehelie is a United States citizen.

13  He graduated from Lake Braddock High School.  Has he

14  struggled in the last few years?  Yes, he has.  He's been

15  smoking too much pot.  And he has been -- had a really

16  difficult time trying to get a job because of his prior

17  felony, which he has a prior felony and that makes it

18  very difficult in this country to get a job.

19       But he has been trying to turn his life

20  around.  He has achieved two years of college.  He is

21  somebody who loves his family.  His -- two of his sisters

22  and his parents are here today in support of him and they

23  would welcome the opportunity to vouch for him.

24       He -- there are ample allegations by the

25  government that he has made statements about violence,

1    but there is no evidence that he has a history of

2    violence.  He has no convictions for violence.  He has

3    not possessed a weapon to the government's knowledge.

4              The government searched his home, and they

5    did not find any weapons.  When he was traveling, what

6    the government didn't mention is that he was going to

7    stay with his aunt for a basketball tournament.  He is a

8    basketball player.  He played for the high school team

9    and he played for Hood College for a year.

10             He does acknowledge that he has struggled

11   with substance abuse, and he would knowledge that he has

12   struggled with unemployment and that those things have

13   caused him some turmoil for the last year or two.

14             But he would seek substance abuse treatment

15   and mental health treatment, and he would certainly

16   submit to electronic monitoring and to the custodianship

17   of his parents.  But, he is not a risk of flight.

18             The government has seized his passport.  And

19   he is -- the government has not alleged that he has done

20   anything other than have loose conversations at the

21   instigation of the FBI.

22             So, we would submit that he should be

23   released at this time and that there are conditions that

24   can both secure his appearance before this Court.

25             I would point out that the prior failures to

1    appear are seven -- six years old when he was still a

2    teenager, and he did complete the probation that the

3    government has made -- has raised.  He completed that

4    successfully ultimately.

5            So, we would ask this Court to consider

6    conditions which would permit him to be released to the

7    custodianship of his family who are here today and are

8    willing to change their work schedule so that one of --

9    his parents are willing to change their work schedules so

10   that one of them can always be at home with him.  And we

11   would ask the Court that if the Court is considering

12   doing that, that we would submit that he would -- he

13   would readily agree to an attend substance abuse

14   treatment and mental health counseling at the Court's --

15   the direction of the probation officer to assist him.

16           THE COURT:  Now, Mr. Wehelie obviously is a

17   risk of flight based on the four failures -- three

18   failures to appear to court appearances in the past as

19   well as the four failures to appear before his

20   supervising probation officer.

21           However, the Court believes there may be a

22   combination of conditions of release that could

23   reasonable assure his appearance in future court

24   proceedings; that being him being in the custody of his

25   parents, GPS monitoring perhaps.

1          The Court's more concerned with the safety of

2    the community.   The Court will adopt as its own the

3    assessments of nonappearance and danger as set forth on

4    page five of the report.

5          Based on the nature of the instance offense,

6    the Court understands that he's only, at this juncture,

7    been charged with being a felon in possession of

8    firearms.   The types of the firearms that he was in

9    possession which causes this Court significant concerns.

10          The agent in his testimony referenced these

11    firearms as machine guns, capable of firing up to 1200

12    rounds a minute.   He possessed four of them, provided

13    them to someone he believed may have been trying to

14    assist ISIS themselves.   He didn't believe these

15    individuals were FBI agents.   He had no basis to believe

16    that these weapons were inoperable.   His acknowledge at

17    the time is important or his lack of knowledge thereof is

18    important as well.

19          The fact that he had no previous criminal

20    history is a double-edged sword.   In fact, an individual

21    who has a history of crimes of violence this Court may

22    understand why more they would want to join an

23    organization such as ISIL that conducts themselves in

24    such a way as to behead individuals and to burn

25    individuals alive.   An individual that has absolutely no

criminal history, the Court finds it extremely difficult why such an individual would want to join such an organization.

So, the nature of the instant offense, in and of itself, is strong. But the facts and the statements by Mr. Wehelie underline the instant offense, statements he made to three undercover officers while conducting or committing the instant offense in regards to wanting to join ISIL, wanting to travel to join ISIS, if he couldn't join ISIS, what he would actually do, commit attacks in the United States of America cause this Court significant concerns.

Obviously, it causes the Court even more concerns when he's making these statements while he's under the influence of a mood-altering drug. It also causes this Court, in combination with the fact that assessment of danger number three, unknown mental health status with an individual who has an unknown mental health status or possibly an unknown mental health status talking about committing jihad either over in Yemen or Libya or Iraq and Syria or in the United States causes this Court even more concern.

It says an unknown mental health status, but the people who know him best, his parents and his sister believes that he does have an underlying mental health

1    issue.  Without that having been taken care of and the

2    fact that he's around transporting weapons, this Court

3    concludes there are no combination of conditions of

4    release that would reasonably assure the safety of the

5    community.  Therefore Mr. Wehelie will be detained prior

6    to further proceedings.  He is remanded to the custody of

7    the United States Marshals.

8              MS. MERTZ:  Thank you, Your Honor.

9              (Proceedings concluded at 3:19 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE OF TRANSCRIPTION

I, Renecia Wilson, hereby certify that the foregoing is a true and accurate transcript that was typed by me from the recording provided by the court. Any errors or omissions are due to the inability of the undersigned to hear or understand said recording. Further, that I am neither counsel for, related to, nor employed by any of the parties to the above-styled action, and that I am not financially or otherwise interested in the outcome of the above-styled action.

IN WITNESS WHEREOF, I have hereto subscribed my name this 22nd day of July, 2016.


                                    /s/
                            Renecia Wilson, RMR, CRR
                            Official Court Reporter