1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
    -vs-                      :   Case No. 1:16-cr-162
                              :
                              :
YUSUF A. WEHELIE,             :
              Defendant.      :
                              :
------------------------------:
```

DETENTION HEARING

July 13, 2016

Before:   Ivan D. Davis, Mag. Judge

APPEARANCES:

Brandon L. Van Grack and John T. Gibbs,
Counsel for the United States

Cadence Mertz, Counsel for the Defendant

The Defendant, Yusuf A. Wehelie, in person

2

INDEX

WITNESS                          EXAMINATION        PAGE


     RICHARD GAYLORD

                                    DIRECT            4
                                    CROSS            16
                                    REDIRECT         29
                                    RECROSS          32




  EXHIBITS

                    Government's Exhibit 1            7




  CLOSING ARGUMENTS BY:

     MR. VAN GRACK                                   33
     MS. MERTZ                                       36




  COURT'S RULINGS

     THE COURT                                       38

3

1          NOTE:  The case is called to be heard at 2:37 p.m. as

2     follows:

3          THE CLERK:  The United States of America versus Yusuf

4     Abdirizak Wehelie, case number 16-mj-302.

5          MR. VAN GRACK:  Good afternoon, Your Honor.  Brandon

6     Van Grack and John Gibbs on behalf of the United States.

7          THE COURT:  Good afternoon.

8          MS. MERTZ:  Good afternoon, Your Honor.  Cadence

9     Mertz on behalf of Mr. Wehelie.

10         THE COURT:  Good afternoon.  This matter is before

11    the Court on a joint preliminary and detention hearing.  Are

12    the parties ready to proceed?

13         MS. MERTZ:  Yes, Your Honor.

14         MR. VAN GRACK:  Yes, Your Honor.  An indictment was

15    obtained earlier today.  And so, I believe the only matter

16    before the Court is a detention hearing.  And the Government is

17    in fact seeking detention.

18         THE COURT:  Okay.

19         MS. MERTZ:  Your Honor, for the record, we have been

20    informed of that indictment and I have not seen it.

21         THE COURT:  All right.  Have both parties received a

22    copy of the Pretrial Services report in this matter?

23         MR. VAN GRACK:  Yes, we have, Your Honor.

24         MS. MERTZ:  Yes, Your Honor.

25         THE COURT:  Does either party dispute the accuracy of

R. Gaylord - Direct

4

1    the information that is contained in that report?

2            MS. MERTZ:  No, Your Honor.

3            MR. VAN GRACK:  We do not, Your Honor.

4            THE COURT:  The Court will adopt as factually

5    accurate the information that is contained in the Pretrial

6    Services report.

7            Is the Government relying on the Pretrial Services

8    report, or would you like to call a witness or introduce any

9    other further information?

10            MR. VAN GRACK:  Yes, Your Honor, we are relying on

11    the report.  In addition, we will be calling a witness.

12            THE COURT:  All right.  You may proceed.

13            MR. VAN GRACK:  At this time the Government will call

14    Special Agent Richard Gaylord.

15            NOTE:  The witness duly affirms.

16            RICHARD GAYLORD, called by counsel for the United

17    States, first duly affirming, testifies and states:

18        DIRECT EXAMINATION

19    BY MR. VAN GRACK:

20    Q.   Would you please state your name, and spell your last name

21    for the record.

22    A.   My name is Richard Gaylord.  G-a-y-l-o-r-d.

23    Q.   And where are you currently employed?

24    A.   I'm employed at the FBI Washington Field Office.

25    Q.   And what is your current title?

R. Gaylord - Direct

1    A.    I'm a special agent.

2    Q.    And how long have you been a special agent?

3    A.    For 12 years.

4    Q.    And which squad do you serve in at the Washington Field

5    Office?

6    A.    I currently serve on CT5.

7    Q.    What does CT stand for?

8    A.    CT stands for counterterrorism.

9    Q.    And how long have you served in the counterterrorism

10   squad?

11   A.    I have been on that squad for two years.

12   Q.    And can you briefly describe your duties with the

13   counterterrorism squad.

14          MS. MERTZ:  Your Honor, we would stipulate to his

15   expertise.

16          THE COURT:  So stipulated.

17   BY MR. VAN GRACK: (Continuing)

18   Q.    Special Agent Gaylord, are you familiar with the facts of

19   this case?

20   A.    I am.

21   Q.    What is the basis for your familiarity?

22   A.    I am the case agent for the investigation.  I have spoken

23   to other agents who have worked on the investigation.  I have

24   spoken to undercover law enforcement officers who have

25   participated in the investigation.  I have reviewed the

1   evidence and I have listened to recordings made during the

2   investigation.

3   Q.   Special Agent Gaylord, if you wouldn't mind, if you

4   wouldn't mind speaking up.

5   A.   Yes, sir.

6   Q.   Thank you.  Do you see the defendant in court today?

7   A.   I do.

8   Q.   Can you please describe what he is wearing and what he is

9   sitting -- where he is sitting.

10  A.   He is sitting at the table to my left in a green jumpsuit.

11          MR. VAN GRACK:  May the record reflect that the

12  witness has identified the defendant?

13          THE COURT:  The record will so reflect.

14  BY MR. VAN GRACK: (Continuing)

15  Q.   As part of your investigation, did you prepare an

16  affidavit in support of a criminal complaint in this case?

17  A.   I did.

18  Q.   At this time I'm showing you what has been marked as

19  Government's Exhibit 1.

20          Do you recognize that document?

21  A.   I do.

22  Q.   And what is that document?

23  A.   That is the affidavit in support of a criminal complaint

24  and arrest warrant.

25  Q.   I would ask you to turn to page 6 of Government's

```
 1    Exhibit 1.
 2              Is there a signature on that page?
 3    A.   Yes, there is.
 4    Q.   Is that your signature?
 5    A.   It is.
 6    Q.   Is the information contained in Government's Exhibit 1 a
 7    true and accurate reflection of the facts as you knew them when
 8    the affidavit was executed?
 9    A.   It is.
10              MR. VAN GRACK:  At this time, Your Honor, the
11    Government would move Government's Exhibit 1 into evidence.
12              MS. MERTZ:  No objection, Your Honor.
13              THE COURT:  So admitted.
14    BY MR. VAN GRACK: (Continuing)
15    Q.   Are you aware of the citizenship for the defendant?
16    A.   I am.
17    Q.   And what is his citizenship?
18    A.   He is a United States citizen.
19    Q.   And where was he born?
20    A.   He was born in the United States, in Virginia.
21    Q.   And his age?
22    A.   He is 25.
23    Q.   At any attempt in your -- at any point in your
24    investigation, did the defendant attempt to obtain a firearm?
25    A.   He did.
```

R. Gaylord - Direct

8

1   Q.   When?

2   A.   In January of this year.

3   Q.   And who did he attempt to acquire the firearm from?

4   A.   In conversations with one of our undercover law

5   enforcement officers he requested assistance in obtaining a

6   firearm.

7   Q.   And can you describe what occurred in that attempt.

8   A.   In that attempt he asked our undercover law enforcement

9   officer if he would help Mr. Wehelie in getting a firearm for

10  himself and his cousin.

11  Q.   And did the defendant indicate why he wanted his cousin to

12  obtain the firearm?

13  A.   Because his cousin does not have a felony conviction and

14  would be able to maintain the firearm.

15  Q.   And did the defendant indicate in that communication with

16  the undercover law enforcement officer that in fact that weapon

17  would be for both him and his cousin?

18           MS. MERTZ:  Your Honor, objection, leading.

19           MR. VAN GRACK:  Your Honor, I will rephrase.

20  BY MR. VAN GRACK: (Continuing)

21  Q.   Special Agent Gaylord, was this conversation between the

22  defendant and the undercover law enforcement officer recorded?

23  A.   It was.

24  Q.   Have you listened to that recording?

25  A.   I have.

R. Gaylord - Direct

9

1   Q.   What statements did the defendant make about that gun?

2   A.   The defendant said it would definitely be for both of us.

3   Q.   Did in fact the undercover law enforcement officer obtain

4   a weapon for the cousin?

5          MS. MERTZ:  Again, objection, leading.

6   A.   He did --

7          THE COURT:  Overruled.

8   A.   He did not.

9   BY MR. VAN GRACK: (Continuing)

10   Q.   At any point in your investigation did you learn whether

11   the defendant in fact fired a weapon?

12   A.   I did.

13   Q.   Can you describe the circumstances under which you learned

14   that.

15          MS. MERTZ:  Objection, Your Honor, relevance.

16          MR. VAN GRACK:  Your Honor, there's --

17          THE COURT:  This is a detention hearing.  If he fired

18   a weapon, that could be -- the Court could reasonably infer he

19   may be dangerous.  Overruled.

20   A.   The defendant said he had fired an AK-47 while he was in

21   Yemen.

22   BY MR. VAN GRACK: (Continuing)

23   Q.   At any point in your investigation did you learn whether

24   the defendant in fact possessed a firearm?

25   A.   He did.

1    Q.   And can you describe how he became -- had came into

2    possession of that firearm.

3    A.   During a conversation with the undercover law enforcement

4    officer the defendant was asked if he would transport the

5    weapons on behalf of the undercover.

6    Q.   And when did that conversation occur?

7    A.   January of 2016.

8    Q.   And was that conversation recorded?

9    A.   It was.

10   Q.   Have you listened to that conversation?

11   A.   I have.

12   Q.   And what were the firearms that were involved in that

13   offer?

14   A.   The firearms were four Cobray MAC 11 machine guns.

15   Q.   And what is the -- are you aware of the capabilities of

16   the MAC 11?

17   A.   Yes.  They are capable of firing up to 1,200 rounds per

18   minute.

19   Q.   And does the MAC 11 go by another name or have some sort

20   of slang term associated with it?

21   A.   There are multiple.  It is a machine gun.

22   Q.   And did in fact the defendant accept the undercover law

23   enforcement's offer to transport those firearms?

24   A.   He did.

25   Q.   And can you describe the circumstances under which he

1    transported those firearms.

2    A.    In February of 2016 the defendant traveled to Baltimore,

3    Maryland and met with a second undercover law enforcement

4    officer.  At that time he was given the four Cobray MAC 11s.

5    And then he placed them in a bag, concealed them with

6    additional towels and purses to further hide what would be in

7    the bag, and then loaded them into his vehicle and drove down

8    to Fairfax County, Virginia.

9    Q.    And was that interaction in the Baltimore hotel room

10   recorded?

11   A.    It was.

12   Q.    Have you listened to that recording?

13   A.    I have.

14   Q.    And what occurred after the defendant arrived in Virginia?

15   A.    He provided the weapons to another undercover law

16   enforcement officer in a parking lot in Fairfax County,

17   Virginia.

18   Q.    And was that interaction recorded?

19   A.    It was.

20   Q.    And have you listened to that recording?

21   A.    I have.

22   Q.    Was the defendant paid anything for this transaction?

23   A.    He was paid $300.

24   Q.    You mentioned multiple undercover law enforcement

25   officers.  At what point did the defendant first interact with

R. Gaylord - Direct

12

1   a law enforcement officer, undercover law enforcement officer?

2   A.   He first met the undercover law enforcement officer in

3   December of 2015.

4   Q.   And this is the undercover officer who he attempted to

5   obtain a gun for his cousin?

6   A.   Correct.

7   Q.   Did they engage in communications beyond December of 2010?

8   A.   They did.

9   Q.   And what were the topics of those discussions?

10  A.   They discussed illegal activity as well as jihad.

11  Q.   And what -- were those conversations recorded?

12  A.   They were.

13  Q.   Have you listened to those conversations?

14  A.   I have.

15  Q.   What did the defendant say about jihad?

16  A.   The defendant said he loved to jihad and had spoken about

17  it with others.

18  Q.   Did at any point the defendant specifically talk to the

19  undercover law enforcement officer about engaging in jihad?

20  A.   He did.  He spoke to the undercover about potentially

21  providing more materials to the "brothers overseas."  And then

22  the defendant asked the undercover if he would help him in

23  traveling.

24  Q.   At any point in their conversation were terrorist groups

25  discussed?

1   A.    There were.

2   Q.    Which groups were discussed?

3   A.    ISIS, otherwise referred to as ISIL.

4   Q.    And what does ISIS stand for?

5   A.    ISIL stands for the Islamic State in The Levant.

6   Q.    And what did the defendant say about ISIL or ISIS?

7   A.    He -- when he first heard from the undercover that they

8   were talking about ISIS, he became visibly excited and shed a

9   tear.

10  Q.    Did the defendant say anything else about ISIL?

11  A.    He was very supportive.  He said he liked that they would

12  kill a hundred people and be proud of it.

13  Q.    Did the defendant indicate when he first developed his

14  feelings towards ISIL?

15  A.    Yes.  He said he started following ISIL in 2012.

16  Q.    And did the defendant discuss whether he associated people

17  who are supporters of ISIL?

18  A.    He did.  He's spoken with others who he said were down.

19  Q.    And all of these conversations with respect to ISIL, were

20  these conversations recorded?

21  A.    They were.

22  Q.    Have you listened to those recordings?

23  A.    I have.

24  Q.    At any point did the defendant discuss violence associated

25  with ISIL?

R. Gaylord - Direct

14

1   A.    He has.

2   Q.    And what did the defendant say about violence and ISIL?

3   A.    In addition to being proud that they'd kill 100 people,

4   the defendant was watching a video with one of the undercovers,

5   in the recording you could hear the undercover say that the

6   person snapped his neck.  And the defendant laughed and said,

7   yes.

8   Q.    And was this interaction recorded?

9   A.    It was.

10  Q.    Have you listened to that recording?

11  A.    I have.

12  Q.    And the undercover law enforcement officer, is that the

13  original law enforcement officer that you discussed from

14  December 2015?

15  A.    Correct.

16  Q.    At any point did the defendant discuss providing support

17  for ISIL?

18  A.    Yes.

19  Q.    And what did the defendant discuss in terms of that

20  support?

21  A.    The defendant asked the undercover if at some point when

22  "the time is right," he would help him to travel.

23  Q.    Did the defendant make any other comments about traveling

24  to ISIL?

25  A.    He did.  He had said that he would -- he desired to travel

1   to Libya, first Tunisia and then ultimately Libya.

2   Q.   And did the defendant indicate why he wanted to travel to

3   Libya and Tunisia to join ISIL?

4   A.   The defendant thought he would fit in more there and that

5   the government, U.S. government would not be watching that area

6   as closely as say the Middle East.

7   Q.   Why did the defendant believe or state that he believed he

8   would be better able to fit in Libya and Tunisia?

9   A.   He said it was because he was black.

10  Q.   At any point did the defendant indicate what would happen

11  if he was unable to travel to Libya to join ISIL?

12  A.   Yes.

13  Q.   And what did the defendant say he would do if he was

14  unable to travel to Libya?

15  A.   In conversations with the undercover law enforcement

16  officer there is a plan laid out of potentially traveling by

17  boat.  And if not by boat, by plane.

18        And then the defendant said if he could not leave, he

19  would potentially conduct an attack here in the U.S.

20  Q.   Did the defendant discuss what type of attack would occur

21  in the United States?

22  A.   He did.

23  Q.   And what did the defendant say about that attack?

24  A.   He said he would attack a military recruiting station.

25  Q.   And did he discuss the specifics as to how he would attack

16

1  a military recruiting station?

2  A.   He did.  He stated that he would first go in and pretend

3  to enlist in the military so that they would become more

4  comfortable with him, and then he would go back in and shoot up

5  the place.

6  Q.   Did the defendant indicate that there are other means in

7  which he would kill members of the military at the recruiting

8  station?

9  A.   He mentioned potentially getting explosives.

10 Q.   Was that conversation that you just relayed recorded?

11 A.   It was.

12 Q.   Have you listened to that conversation?

13 A.   I have.

14      MR. VAN GRACK:  Your Honor, at this time we have no

15 more questions for Special Agent Gaylord.

16      THE COURT:  Cross-examination.

17      MS. MERTZ:  Thank you, Your Honor.

18 CROSS-EXAMINATION

19 BY MS. MERTZ:

20 Q.   Agent Gaylord, you mentioned that the first contact with

21 your agent and Mr. Wehelie was in December of 2015, correct?

22 A.   Correct.

23 Q.   How did that contact come about?

24 A.   That had come about while Mr. Wehelie was with somebody

25 else in meeting and doing some potential illegal activity.

R. Gaylord - Cross

17

1    Q.    What illegal activity?

2    A.    Moving cigarettes from -- untaxed cigarettes from Virginia

3    to Maryland.

4    Q.    And the undercover agent was involved in the moving of

5    cigarettes?

6    A.    He was not involved in that, no.

7    Q.    He met Mr. Wehelie during that incident?

8    A.    Yes.

9    Q.    And did he befriend Mr. Wehelie?

10   A.    He did.

11   Q.    He continued the contact with Mr. Wehelie?

12   A.    He did.

13   Q.    He did that intentionally?

14   A.    He did.

15   Q.    And did he continue to call Mr. Wehelie on his phone?

16   A.    He did.

17   Q.    And he continued to text message with him?

18   A.    Yes.

19   Q.    And reach out to him maybe on Facebook?

20   A.    I'm not sure if it was on Facebook, but he did continue to

21   reach out.

22   Q.    And about how often would he reach out to Mr. Wehelie?

23   A.    I cannot say.

24   Q.    Were other agents reaching out to Mr. Wehelie as well?

25   A.    I don't believe so.

18

1  Q.   And this contact went on for approximately two months

2  based on the timeline in your affidavit; is that correct?

3  A.   Correct.

4  Q.   And after Mr. Wehelie delivered the guns from one agent to

5  another agent in February of 2016, did the FBI arrest him?

6  A.   They did not.

7  Q.   And that was five months ago, correct?

8  A.   Correct.

9  Q.   Did the agent make any attempt to ascertain Mr. Wehelie's

10 state of mind before he attempted to befriend him and contacted

11 him on a regular basis?

12 A.   He did not.

13 Q.   Did he make any attempt to determine whether or not Mr.

14 Wehelie was suffering from any kind of mental illness at that

15 time?

16 A.   He did not.

17 Q.   Whether or not he had any kind of substance abuse

18 addictions?

19 A.   He did not.

20 Q.   He didn't make any attempt to determine whether or not Mr.

21 Wehelie was in a fragile state of mind?

22 A.   No.

23 Q.   Did he attempt to ascertain whether or not Mr. Wehelie was

24 struggling for money?

25 A.   No.

R. Gaylord - Cross

19

1   Q.   But he did offer to pay Mr. Wehelie money at times?

2   A.   He did.

3   Q.   And on how many occasions did he offer to pay Mr. Wehelie

4   money?

5   A.   I believe he paid him once in cash for the drugs, and then

6   he provided him a phone.

7   Q.   I'm sorry, what was the last part?

8   A.   He provided him a telephone.

9   Q.   So there were two instances on which the agent paid Mr.

10  Wehelie apart from the gun incident; is that right?

11  A.   No, that was the gun incident.

12  Q.   I'm sorry?

13  A.   The $300, the first payment, was for that.

14  Q.   And then he also -- the agent also paid Mr. Wehelie for

15  drugs and for a phone?

16  A.   Drugs?

17  Q.   I'm sorry, did you --

18  A.   No.

19  Q.   Let me -- let me back up.  How many occasions did the

20  agent pay Mr. Wehelie money?

21  A.   He paid him twice.

22  Q.   And one was for the guns and one was for a phone?

23  A.   One was with a phone.  There was no cash with the phone.

24  He provided him a phone instead of cash.

25  Q.   What was the first instance of payment about?

R. Gaylord - Cross

20

1   A.   It was about the guns.

2   Q.   How much money did he pay Mr. Wehelie?

3   A.   $300.

4   Q.   And when was that?

5   A.   That was March -- or February 23.

6   Q.   And what was the other instance of payment?  What date?

7   A.   That was -- I don't really recall the exact date of that

8   payment.  That is when he was provided a cellular telephone.

9   Q.   And was that February of 2016?

10  A.   I don't believe so.

11  Q.   January?

12  A.   I believe it was January.

13  Q.   January of 2016 he paid Mr. Wehelie money?

14  A.   He provided -- he provided him a cellular telephone.

15  Q.   He did not pay him any cash?

16  A.   No.

17  Q.   What kind of phone did he provide him?

18  A.   I believe it was a Samsung Galaxy.

19  Q.   Was it new?

20  A.   It was.

21  Q.   What's the approximate value of that phone?

22  A.   I believe it may be around $600.

23  Q.   On the first instance when the agent met Mr. Wehelie, was

24  anybody else present?

25  A.   Yes.

1    Q.    Who else was present?

2    A.    There were multiple others present.

3    Q.    Could you identify them, please.

4          MR. VAN GRACK:  Your Honor, we would object to the

5    relevance of the other individuals involved in that initial

6    meeting.  There are other national security and law enforcement

7    sensitivities here, and we question its relevance in terms of a

8    conversation that was recorded.  And the agent actually relayed

9    the contents of that, of those recordings.

10         THE COURT:  Counsel.

11         MS. MERTZ:  Your Honor, I have two responses.  One is

12   that the Government opened the door to this line of questioning

13   by going into great detail on these alleged recorded phone

14   calls and who said what.  And these are phone -- these are

15   phone calls and meetings with multiple individuals present.

16         And it is relevant to detention whether or not Mr.

17   Wehelie was agreeing with what other people were saying or

18   whether or not -- and other people were instigating

19   conversation.

20         THE COURT:  How do you -- why do you need to know who

21   those other people were to determine that answer to that

22   question?

23         MS. MERTZ:  Fair enough, Your Honor, I'll move on.

24   BY MS. MERTZ: (Continuing)

25   Q.   So there were multiple other people present?

1    A.    Yes.

2    Q.    Were they all FBI agents?

3    A.    No.

4    Q.    Were some of them confidential informants?

5    A.    They were not confidential informants of the FBI.

6    Q.    And where did that first meeting take place?

7    A.    In Fairfax County, Virginia.

8    Q.    Where specifically?

9    A.    At a storage location.

10   Q.    Whose storage location?

11   A.    I do not know.

12   Q.    Was that meeting set up at the behest of the FBI?

13   A.    It was.

14   Q.    What was the purpose of that meeting?

15   A.    To introduce an undercover employee to Mr. Wehelie.

16   Q.    And yet this was the FBI's first meeting with him?

17   A.    Yes.

18   Q.    So you knew you were targeting Mr. Wehelie?

19   A.    Yes.

20   Q.    Was that -- and was that first meeting recorded on

21   December 10?

22   A.    I do not -- I believe it was, but I know we have the

23   statement of the undercover employee.

24   Q.    And the other people present were civilians?

25   A.    There were other law enforcement.

R. Gaylord - Cross

23

1  Q.   In paragraph 7(a) of your affidavit you make a reference

2  to something called a notional scenario.  Is that another term

3  for hypothetical?

4  A.   Yes.

5  Q.   So that paragraph describes a series of facts that were

6  posed by the FBI agent hypothetically?

7  A.   Yes.

8  Q.   In a conversation with Mr. Wehelie?

9  A.   Correct.

10  Q.   And none of those facts actually every occurred?

11  A.   No, they did not.

12  Q.   Did the FBI make any effort to determine whether or not

13  Mr. Wehelie was telling the truth when he said he'd fired a

14  weapon before?

15  A.   We did not.  There did not seem to be any way to actually

16  verify whether on his time in a foreign country we could or

17  could not tell he fired a weapon.

18  Q.   Did the FBI make any effort to ascertain whether or not

19  Mr. Wehelie had ever possessed a weapon before?

20  A.   Again, we could not verify that time.  However, we did

21  verify that he was in Yemen at the time when he stated.

22  Q.   And he has family in Yemen, that's correct?  Or he had at

23  the time?

24  A.   At the time, yes.

25  Q.   His brother in fact?

1    A.    Correct.

2    Q.    And that December 22 conversation, how was that recorded?

3    A.    Digitally.  We had a digital recorder.

4    Q.    And you make reference to this term "whole K."  Can K be

5    used as slang for other things on the street?

6    A.    I can't say exactly what K could or could not be used for.

7    Q.    You've never heard it used as a term for Special K, the

8    drug?

9    A.    I have heard that.

10   Q.    And have you ever heard it used as a term for a kilo, such

11   as a quantity of drugs?

12   A.    I have.

13   Q.    So it could be slang for something other than a gun?

14   A.    However, Mr. Wehelie used it in terms of attacking a

15   military location.  He said, get a whole K fully loaded.

16   Q.    And that, again, is in the context of the hypothetical

17   scenario posed by the FBI agent?

18   A.    No.  That was in Mr. Wehelie's hypothetical of what would

19   happen if he could not travel.

20   Q.    And in paragraph 7(b) you refer to this conversation on

21   January 21.  How was that phone conversation recorded?

22   A.    We have audio and video.

23   Q.    And I'm sorry, was that an in-person meeting or a

24   telephone?

25   A.    The 21st was in person.

R. Gaylord - Cross

25

1  Q.   And were other people present?

2  A.   Yes.

3  Q.   How many other people were present?

4  A.   One person joined them briefly.

5  Q.   I'm sorry?

6  A.   One person joined them briefly.

7  Q.   Was that person law enforcement?

8  A.   He was.

9  Q.   And in that conversation, did Mr. Wehelie make any

10 monetary offer to purchase a weapon?

11 A.   I do not recall him making an offer to purchase one.  He

12 inquired how much one would cost.

13 Q.   But he did not offer to pay a certain amount to buy one?

14 A.   No.

15 Q.   And there's nothing in your affidavit about any follow-up

16 conversation about him purchasing his own weapon?

17 A.   Correct.

18 Q.   And there was no conversation, future -- further

19 conversation about him purchasing a weapon for himself, was

20 there?

21 A.   For himself, no.

22 Q.   Returning to the conversation on February 18.  How was

23 that conversation recorded?

24 A.   We have audio and visual -- audio and video recordings.

25 Q.   And how many people were present at that meeting?

R. Gaylord - Cross

26

1   A.   Which meeting?

2   Q.   The meeting on February 18.

3   A.   Which location?

4   Q.   Sorry, I will turn your attention to paragraph 8(a).

5   A.   Okay.

6   Q.   And that appears to be at a hotel room in Baltimore,

7   Maryland?

8   A.   Uh-hmm.

9   Q.   How many people were present at that meeting in the hotel

10  room?

11  A.   Two.

12  Q.   Besides Mr. Wehelie?

13  A.   No, one besides Mr. Wehelie.

14  Q.   Okay.  And that's UC 2?

15  A.   Correct.

16  Q.   And who had proposed the idea that Mr. Wehelie transport

17  four guns?

18  A.   UCE 1.

19  Q.   So it was his idea?

20  A.   Yes.

21  Q.   And the guns involved in paragraph 8(a) had been rendered

22  inoperable?

23  A.   Yes.

24  Q.   Had the FBI ever fired those guns to ascertain whether or

25  not they were operable?

1   A.    I cannot say whether anybody at the FBI had.  I had not.

2   Q.    So you don't know if they were ever operable?

3   A.    I do not.

4   Q.    And after the one FBI agent gave the four guns to Mr.

5   Wehelie, he then drove them to a second FBI agent waiting in

6   Springfield, Virginia; is that correct?

7   A.    He drove them to another undercover law enforcement

8   officer.

9   Q.    All right.  So the only transfer that Mr. Wehelie

10  accomplished was from one FBI agent to another FBI agent?

11  A.    Yes.

12  Q.    And after he delivered the guns, the FBI agent paid him

13  money, correct?

14  A.    On a separate meeting, yes.

15  Q.    On a separate meeting.  But they did not arrest him?

16  A.    No.

17  Q.    Did the -- you do say in here that you followed,

18  surveilled Mr. Wehelie on his trip from Baltimore to

19  Springfield, correct?

20  A.    Yes.

21  Q.    And did you follow him or somebody follow him the entire

22  way?

23  A.    Yes.

24  Q.    Did he stop at all?

25  A.    No.

1  Q.   Was anybody else involved in the transfer besides Mr.

2  Wehelie?  Was there anybody else with him in the car?

3  A.   No.

4  Q.   And he never trans -- he never switched cars or anything

5  like that?

6  A.   No.

7  Q.   Was anybody -- how many agents were waiting for him in

8  Springfield?

9  A.   He met with one person.

10 Q.   And after that transfer on February 18, five months ago,

11 did the agent reach out to Mr. Wehelie again?

12 A.   The agent that he dropped him off to, no.

13 Q.   Did the undercover agent number 1, as he referred to in

14 your affidavit, reach out to Mr. Wehelie again?

15 A.   Yes.

16 Q.   How many times would you say he reached out to Mr. Wehelie

17 after that?

18 A.   Numerous.  They had --

19 Q.   For how long?

20 A.   For several months.

21 Q.   And after that date, February 18, Mr. Wehelie did not make

22 any further attempts to purchase a firearm; is that right?

23 A.   Correct.

24 Q.   And there is no record that he has ever purchased a

25 firearm?

1    A.    No.

2    Q.    And other than that occasion and the instance in paragraph

3    7(a) in Yemen, there is no evidence he's ever possessed any

4    other firearm, is there?

5    A.    No.

6    Q.    And your agents searched Mr. Wehelie's family's home last

7    week; is that correct?

8    A.    Yes.

9    Q.    They find any firearms?

10   A.    No.

11   Q.    And in response to the undercover agent's attempts to

12   reach out to Mr. Wehelie after February 18, would it be fair to

13   say that Mr. Wehelie stopped responding to him?

14   A.    Yes.

15          MS. MERTZ:  Nothing further, Your Honor.

16          THE COURT:  Any redirect?

17          MR. VAN GRACK:  Your Honor, just a few.

18        REDIRECT EXAMINATION

19   BY MR. VAN GRACK:

20   Q.    Just now defense counsel asked whether after February 18

21   the undercover law enforcement officer, UCE 1, reached out to

22   the defendant.  Do you recall that question?

23   A.    Yes.

24   Q.    Did in fact after February 18 UCE 1 communicate with the

25   defendant?

1  A.   Yes.

2  Q.   And in those communications, did the defendant and the law

3  enforcement officer have any discussions about ISIL?

4  A.   Yes.

5  Q.   In that period of time, is that the period of time in

6  which the defendant discussed going to a military recruiting

7  center and shooting individuals?

8  A.   Yes, it was.  That's also the time when he was showing the

9  videos to the undercover.

10  Q.   And during that period of time until the day he was

11  arrested, was the defendant under surveillance?

12  A.   Yes.

13  Q.   And how would you describe that surveillance?

14  A.   Constant and daily.

15  Q.   And could you tell the Court -- when was the defendant

16  arrested?

17  A.   July 7.

18  Q.   And can you tell the Court why the defendant was arrested

19  on July 7?

20  A.   The defendant was traveling.

21  Q.   Where was the defendant traveling to?

22  A.   To Minneapolis.

23  Q.   And why did the defendant -- why did the FBI decide to

24  arrest the development -- arrest the defendant as he was

25  traveling to Minneapolis?

R. Gaylord - Redirect

31

A.   We did not know if this was the first part of any other

travel.  We had no idea where his destination was, ultimate

destination was.

          MR. VAN GRACK:  No more questions, Your Honor.

          THE COURT:  All right.

          MS. MERTZ:  Your Honor, if I may, briefly.

          THE COURT:  They have the obligation.  So they get

the last word.

          MS. MERTZ:  Thank you, Your Honor.

          THE COURT:  Agent Gaylord --

          THE WITNESS:  Yes, sir.

          THE COURT:  -- if you know, to the best of your

understanding, did Mr. Wehelie -- who did Mr. Wehelie believe

he was dealing with when he was dealing with the three

undercovers?

          THE WITNESS:  To the best of my knowledge, based on

the recordings and the conversation I overheard, he believed he

was dealing with somebody who may potentially help him travel

to Syria or to Libya and join ISIS.

          THE COURT:  So you have no information in your

possession that would suggest that Mr. Wehelie believed he was

dealing with FBI agents?

          THE WITNESS:  No, sir.

          THE COURT:  You have no information in your

possession that would suggest that Mr. Wehelie when he moved

R. Gaylord - Recross

32

1    the four firearms or machine guns from Undercover 2 to

2    Undercover 3, that he had any information in his possession

3    that would suggest that he knew those weapons were inoperable?

4              THE WITNESS:  No.

5              THE COURT:  Thank you.  Does the Court's questions

6    elicit any other questions from counsel?

7              MR. VAN GRACK:  No more questions from the

8    Government, Your Honor.

9              MS. MERTZ:  Just one question, Your Honor.

10         RECROSS-EXAMINATION

11   BY MS. MERTZ:

12   Q.   Was the -- when Mr. Wehelie transferred the weapons, was

13   that understood to be in connection -- what was the purpose of

14   that purchase, to his knowledge?

15   A.   There was no purpose laid out to him.  He was just asked,

16   and he agreed.

17   Q.   And it had nothing to do with alleged terrorism or

18   anything like that?

19   A.   No.

20             MS. MERTZ:  Thank you.

21             THE COURT:  Agent Gaylord, you may step down.

22             NOTE:  The witness stood down.

23             THE COURT:  The Government have anything further?

24             MR. VAN GRACK:  No, we do not, Your Honor.

25             THE COURT:  Government have argument?

1          MR. VAN GRACK:  Yes, Your Honor.  The primary basis

2     for the Government seeking detention is the danger to the

3     community.

4          As the Court just heard from Special Agent Gaylord's

5     testimony, the representations made by the defendant are of the

6     most serious type of danger.  It's an individual who spoke

7     about not just supporting ISIS, not just encouraging others to

8     support ISIS, but actually discussing a plan that he had

9     thought through of traveling to join ISIS, as well as a plan

10    that if that travel failed, that he would in fact engage in

11    terrorist activity in the United States.

12         Again, not just a random shooting, but a plan to go

13    to a specific location, a military recruiting center, and how

14    he would dupe the individuals in that military recruiting

15    center into thinking that this was someone who was actually

16    seeking to be recruited.

17         In this -- the United States would argue this is the

18    most serious type of danger in light of what's occurred in

19    Orlando, San Bernardino, these are the types of comments and

20    actions that we must as a community and the United States take

21    seriously.  In those instances, there is often comments and

22    questions about what signs were there, what indicators did we

23    have as a community that this individual was going to engage in

24    violence.

25         And the United States submits that the testimony from

1    Special Agent Gaylord indicates that these are the types of

2    indicators and signs.  This is an individual who sought to

3    obtain a firearm for himself.  In fact, he sought to obtain it

4    through another individual to conceal his potential possession.

5    That's the cousin that Special Agent Gaylord referred to

6    earlier.

7            It's someone who has violated the law in the past.

8    Someone who for $300 was willing to violate the law again.

9            In addition to you have someone who made statements

10   about supporting ISIL, showed videos, enjoyed, was brought to

11   tears in emotion when asked whether he was a supporter of ISIL.

12   And again, relayed specific plans that he had in mind in order

13   to provide support for ISIL.

14           In addition to the dangerous aspect, the United

15   States submits that we have a very serious offense, a ten-year

16   felony in which the evidence is overwhelming.  As heard in the

17   testimony and in the complaint, the evidence are recordings and

18   individuals who specifically corroborate that the defendant

19   took possession of the weapons, knew what the weapons were, and

20   transported them across state lines.

21           We also have, as relayed in the Pretrial Services

22   report, an indication that in fact he was a felon and had a

23   felony on his record.

24           And the final point that the Government would raise

25   is, as relayed in the Pretrial Services report, you have an

1  individual with a history of nonappearance for his -- the

2  felony that is identified, it is a statutory burglary that he

3  was sentenced to three years imprisonment, suspended,

4  conditioned on going to behavior and probation.  And the

5  defendant violated that probation.  As discussed, there were

6  four instances in which the defendant failed to appear in front

7  of the Probation officer.

8            There is also another instance reported in the report

9  in which the individual -- the defendant failed to appear in

10  court, and I believe there was a bench warrant out for his

11  arrest.

12            And then the final comment that the Government would

13  make at this time is in the report there is a representation

14  that his family would be willing to host him and watch over him

15  as a condition of release.  And the United States submits that

16  all of the conduct that was just described, not just in the

17  report but the evidence described in court, occurred while the

18  defendant was with his family, either living with his family,

19  or near his family, or when he was spending a significant

20  amount of time with his family.

21            And so, that gives the Government no comfort and

22  should give the community no comfort that that in fact would

23  allow the defendant to meet whatever conditions defense counsel

24  would believe are sufficient.

25            THE COURT:  Thank you.

1          MS. MERTZ:  Thank you, Your Honor.  Notwithstanding

2     the Government's attempt to portray Mr. Wehelie with -- or

3     paint him with all of the fervor and furor that's been going on

4     in the country for the last few weeks, Mr. Wehelie is charged

5     with being a felon in possession.  He is not charged with any

6     charges relating to terrorism.

7          Having now had a chance to --

8          THE COURT:  Is it your position that this Court is

9     only supposed to consider, in making a determination on the

10    safety of the community, the current charges against him?

11         MS. MERTZ:  Absolutely not, Your Honor.  However, I

12    would suggest that the weight of some of the Government's

13    evidence may be belied by the charge that they are bringing in

14    this case.

15         Mr. Wehelie, as the Probation officer's report

16    states, was not with his family for the last year.  He is now

17    of recently with his family again.

18         He -- Mr. Wehelie is a United States citizen.  He

19    graduated from Lake Braddock High School.  Has he struggled in

20    the last few years?  Yes, he has.  He's been smoking too much

21    pot, and he has had a really difficult time trying to get a job

22    because of his prior felony.  Which he has a prior felony, and

23    that makes it very difficult in this country to get a job.

24         But he has been trying to turn his life around.  He

25    has achieved two years of college.  He is somebody who loves

1  his family.  His entire -- two of his sisters and his parents

2  are here today in support of him, and they would welcome the

3  opportunity to vouch for him.

4          There are ample allegations by the Government that he

5  has made statements about violence, but there is no evidence

6  that he has a history of violence.  He has no convictions for

7  violence.

8          He has not possessed a weapon to the Government's

9  knowledge.  The Government searched his home and they did not

10  find any weapons.

11          When he was traveling, what the Government didn't

12  mention is that he was going to stay with his aunt for a

13  basketball tournament.  He is a basketball player.  He played

14  for his high school team and he played for Hood College for a

15  year.

16          He does acknowledge that he has struggled with

17  substance abuse, and he would acknowledge that he has struggled

18  with unemployment, and that those things have caused him some

19  turmoil for the last year or two.  But he would seek substance

20  abuse treatment and mental health treatment, and he would

21  certainly submit to electronic monitoring and to the

22  custodianship of his parents.

23          But he is not a risk of flight.  The Government has

24  seized his passport.  And he is -- the Government has not

25  alleged that he has done anything other than have loose

1    conversations at the instigation of the FBI.

2           So we would submit that he should be released at this

3    time and that there are conditions that can both secure his

4    appearance before this Court -- I would point out that the

5    prior failures to appear are seven -- six years old when he was

6    still a teenager.  And he did complete the probation that the

7    Government has made -- has raised, he completed that

8    successfully ultimately.

9           So we would ask this Court to consider conditions

10   which would permit him to be released to the custodianship of

11   his family who are here today and are willing to change their

12   work schedule so that one of -- his parents are willing to

13   change their work schedule so that one of them can always be at

14   home with him.

15          And we would ask the Court that if the Court is

16   considering doing that, that we would submit that he would --

17   he would readily agree to attend substance abuse treatment and

18   mental health counseling at the Court's -- the direction of the

19   Probation officer to assist him.

20          THE COURT:  Well, Mr. Wehelie, obviously, is a risk

21   of flight based on the four -- or three failures to appear to

22   court appearances in the past, as well as the four failures to

23   appear before his supervising Probation officer.

24          However, the Court believes there may be a

25   combination of conditions of release that could reasonably

1  assure his appearance at future court proceedings, that being

2  him being in the custody of his parents, GPS monitoring

3  perhaps.

4            The Court is more concerned with the safety of the

5  community.  The Court will adopt as its own the assessments of

6  nonappearance and danger as set forth in page 5 of the report.

7            Based on the nature of the instant offense -- the

8  Court understands that he is only at this juncture been charged

9  with being a felon in possession of firearms.  The types of the

10 firearms that he was in possession of causes this Court

11 significant concerns.

12           The agent in his testimony referenced these firearms

13 as machine guns capable of firing up to 1,200 rounds a minute.

14 He possessed four of them, provided them to someone he believed

15 may have been trying to assist ISIS themselves.  He didn't

16 believe these individuals were FBI agents.  He had no basis to

17 believe that these weapons were inoperable.  His knowledge at

18 the time is important -- or his lack of knowledge thereof is

19 important as well.

20           The fact that he had no previous criminal history is

21 a double-edged sword.  In fact, an individual who has a history

22 of crimes of violence, this Court may understand why more they

23 would want to join an organization such as ISIL that conducts

24 themselves in such a way as to behead individuals and to burn

25 individuals alive.

1          An individual who has absolutely no criminal history,

2    this Court finds it extremely difficult why such an individual

3    would want to join such an organization.

4          So the nature of the instant offense in and of itself

5    is strong.  But the facts and the statements by Mr. Wehelie

6    underlying the instant offense, statements he made to three

7    undercover officers while conducting or committing the instant

8    offense in regards to wanting to join ISIL, wanting to join to

9    travel join ISIS, if he couldn't join ISIS, what he would

10   actually do, commit attacks in the United States of America,

11   cause this Court significant concerns.

12         Obviously, it causes the Court even more concerns

13   when he's making these statements while he's under the

14   influence of a mood-altering drug.

15         It also causes this Court, in combination with the

16   fact that assessment of danger number three, unknown mental

17   health status -- with an individual who has an unknown mental

18   health status or possibly an unknown mental health status

19   talking about committing jihad either over in Yemen, or Libya,

20   or Iraqi, and Syria, or in the United States, causes this Court

21   even more concern.

22         It says an unknown mental health status, but the

23   people who know him best, his parents and his sister, believe

24   he does have an underlying mental health issue.

25         Without that having been taken care of, and the fact

41

1   that he is around transporting weapons, this Court concludes

2   that there are no combination of conditions of release that

3   would reasonably assure the safety of the community.

4           Therefore, Mr. Wehelie will be detained prior to

5   further proceedings.  He is remanded to the custody of United

6   States Marshals.

7           MS. MERTZ:  Thank you, Your Honor.

8           NOTE:  The hearing concluded at 3:20 p.m.

9       ------------------------------------------------

10

11

12

13

14      C E R T I F I C A T E  of  T R A N S C R I P T I O N

15

16          I hereby certify that the foregoing is a true and
    accurate transcript that was typed by me from the recording
17  provided by the court.  Any errors or omissions are due to the
    inability of the undersigned to hear or understand said
18  recording.

19          Further, that I am neither counsel for, related to,
    nor employed by any of the parties to the above-styled action,
20  and that I am not financially or otherwise interested in the
    outcome of the above-styled action.

21

22

23                          /s/ Norman B. Linnell

24                          Norman B. Linnell
                            Court Reporter - USDC/EDVA

25