IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
          Plaintiff,               )      1:16-cr-162
                                   )
     vs.                           )
                                   )
YUSUF ABDIRIZAK WEHELIE,           )
                                   )
          Defendant.               )
_____)

SENTENCING HEARING

July 14, 2017

---

BEFORE:      THE HONORABLE GERALD BRUCE LEE
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE GOVERNMENT: OFFICE OF THE UNITED STATES ATTORNEY
                    BY: JOHN T. GIBBS, ESQ.

FOR MR. WEHELIE:    DIMURO GINSBERG PC
                    NINA J. GINSBERG, ESQ.

---

OFFICIAL COURT REPORTER: RENECIA A. WILSON, RMR,CRR
                         U.S. District Court
                         401 Courthouse Square
                         Alexandria, VA  22314
                         (703)501-1580

1           (Thereupon, the following was heard in open court
2    at 9:03 a.m.)
3           THE CLERK:   United States of versus Yusuf
4    Abdirizak Wehelie, case number 16-CR-162.
5           MR. GIBBS:   Good morning, Your Honor.   John
6    Gibbs on behalf of the United States.   And with me at
7    counsel table is Special Agent Rick Gaylord of the FBI.
8           THE COURT:   Good morning.
9           MS. GINSBERG:   Good morning, Your Honor.
10   Nina Ginsberg on behalf of Mr. Wehelie who is present in
11   the courtroom.
12          THE COURT:   Good morning, Ms. Ginsberg.
13          Good morning, Mr. Wehelie.
14          Ms. Ginsberg --
15          MS. GINSBERG:   Yes, sir.
16          THE COURT:   -- I take it you and Mr. Wehelie
17   have had an opportunity to review the presentence report?
18          MS. GINSBERG:   Yes, we have.
19          THE COURT:   And you had an objection to I
20   believe it was paragraph 46.   And I issued a notice of
21   intent to consider an upward departure.   And I'm prepared
22   to hear from you and the government about that.
23          MS. GINSBERG:   Your Honor, before I do that,
24   we also did object to the criminal history category as
25   overrepresenting the seriousness of Mr. Wehelie's

1    criminal record and --

2              THE COURT:  You can address that as well.

3              MS. GINSBERG:  Maybe I'll address that one

4    first because I think that's the easier of the two.

5              THE COURT:  All right.

6              MS. GINSBERG:  Your Honor, the presentence

7    report calculated an offense level of 19 and a criminal

8    history category of three which was based on five

9    criminal history points.  Those points were based on two

10   convictions -- well, one Section 251 disposition on a

11   marijuana offense when Mr. Wehelie was 18 years old, a

12   second marijuana offense where he was found guilty in

13   absentia which, according to the presentence report,

14   resulted from a traffic stop where -- a vehicle in which

15   he was a passenger --

16             THE COURT:  Hold on just one second.  Hold on

17   just one second.  Okay, I'm with you.

18             MS. GINSBERG:  The second -- the actual first

19   conviction for possession of marijuana was the result of

20   a traffic stop of a vehicle that he was a passenger in.

21   I think the car had a --

22             THE COURT:  This is the one he was found

23   guilty in absentia?

24             MS. GINSBERG:  That's correct.  But it was

25   based on a small amount of marijuana that was found

1    outside one of the passenger side doors, and he was one

2    of a number of occupants in the vehicle.

3              So, there was never -- everyone denied

4    ownership of the marijuana.  So, there was never a

5    determination of who actually possessed the marijuana,

6    but he did not show up in court.

7              THE COURT:  I understand you're telling me

8    these things, but the record says he was guilty in

9    absentia which means he never showed up, right?

10             MS. GINSBERG:  That's right.

11             THE COURT:  I can't really -- I don't know

12   really what happened other than what you're telling me

13   now.

14             MS. GINSBERG:  I'm just repeating what was in

15   the presentence report.

16             THE COURT:  Okay.

17             MS. GINSBERG:  So, there was a -- the

18   probation officer obviously made some inquiry into the

19   court records.

20             THE COURT:  But it sounds like you're saying,

21   well, maybe he wasn't to be held responsible for the

22   offense.  Is that what you're saying?

23             MS. GINSBERG:  I'm saying in terms of

24   assessing the seriousness of his past record, that it is

25   not clear from the facts as -- as outlined by the

1    probation officer that he was actually the person in

2    possession of the marijuana.

3              He did fail to appear in court and was found

4    guilty.  That is correct.

5              THE COURT:  All right.

6              MS. GINSBERG:  He was also convicted of a

7    statutory burglary for which he received a 3-year

8    suspended sentence.  He ultimately served 90 days for a

9    probation violation because -- which occurred after he

10   returned from his trip overseas.  It occurred because he

11   was tested positive for marijuana on several occasions.

12             And that offense involved breaking into a

13   house with a friend.  I think a laptop computer and some

14   alcohol was stolen.

15             And the last offense when he was 23 was a

16   misdemeanor embezzlement case where he received a

17   sentence of 180 days --

18             THE COURT:  That's when he was working at the

19   sports store?

20             MS. GINSBERG:  That's correct, Your Honor.

21   And all of that sentence was suspended.

22             All that's to say that while there was a

23   pattern of minor criminal activity, it was treated by the

24   Fairfax courts as relatively minor.  He did not serve any

25   more than this 90 days that was imposed as a result of

1    the probation violation.

2              And it -- in keeping with Your Honor's

3    opinion in *United States versus Nelson*, the history of

4    minor marijuana offenses and nonviolent crimes, we would

5    submit, overrepresent -- a criminal history category 3

6    overrepresents the seriousness of the conduct -- of the

7    type of criminal record one would expect to see of a

8    person who is assigned a criminal history category 3.

9              THE COURT:  So, you think he should be put to

10   criminal history category 2?

11             MS. GINSBERG:  I do, Your Honor.

12             THE COURT:  All right.

13             MS. GINSBERG:  I think that's a more

14   appropriate criminal history, a better reflection of his

15   record of nonviolent -- minor nonviolent offenses and the

16   fact that he's had minimal incarceration, minimal

17   probation supervision.

18             And what I think most importantly is that he

19   had no prior treatment for substance abuse or PTSD which

20   were clearly part of his personal history.

21             And that that could --

22             THE COURT:  I had the impression that PTSD

23   came after these offenses in 2014; is that right?

24             MS. GINSBERG:  It came after the --

25             THE COURT:  I'm talking about the date from

1   the standpoint of chronologically, that aspect of it
2   comes after 2014; is that right?
3               MS. GINSBERG:  It comes after the probation
4   violation -- it came before -- it came after the two
5   marijuana convictions and the burglary conviction.  It
6   came before the probation violation and the embezzlement.
7               THE COURT:  So, what year was it?
8               MS. GINSBERG:  I'm sorry.
9               THE COURT:  What year was the incident that
10  led to PTSD.  What year was that?
11              MS. GINSBERG:  That was 2015, I believe.
12              THE COURT:  So, that confirms what I just
13  said, if it happened in 2015, that wasn't what -- that
14  was not involved in the offenses you just described to
15  me.  That was post that.
16              MS. GINSBERG:  Your Honor, his probation
17  supervision was after he came back from overseas.
18              THE COURT:  So my question is, what year did
19  he come back from overseas?
20              MS. GINSBERG:  Oh, Your Honor, I apologize,
21  2010.
22              THE COURT:  Oh, okay.
23              MS. GINSBERG:  He came back in 2010.
24              THE COURT:  All right.  So that does conform
25  with your argument.  Thank you.

1          MS. GINSBERG:  So, we would -- we would
2    submit that the criminal history category 3 consistent
3    with how this Court has previously applied the enhance --
4    the criminal history analysis and certainly other judges
5    in this district that the criminal history category 3
6    overrepresents that -- the seriousness of that record.
7          THE COURT:  All right, let me hear from the
8    government on that.
9          MR. GIBBS:  Your Honor, I think as a starting
10   point we would obviously disagree that the criminal
11   history category is overrepresented.  I think, you know,
12   we have to begin with the fact that when the probation
13   officer, Mr. Sewell, prepared the report, he scored this
14   correctly.  I mean, there's no dispute that the
15   calculations that he made are accurate.
16          And in terms of the offenses themselves, we
17   have two marijuana convictions at age 18.  As the Court
18   noted rightly, the second one he was charged in absentia
19   because he didn't show up which I don't think is to his
20   benefit.
21          We then had a residential burglary.  And
22   again, I think it's important.  This is the felony
23   offense that prevented him from possessing firearms.
24   This was a serious offense.  It was -- he and at least
25   one other individual broke into someone's home, did $800

1   damages in breaking in, stole a computer valued at

2   $2,000, stole liquor valid at about $50.  And so, I think

3   it would be a mistake to sort of pass this off as a

4   youthful indiscretion.

5           THE COURT:  The legal question is whether the

6   criminal history category overstates the seriousness of

7   the prior criminal record and the risk of recidivism.

8   Can you address that question for me?

9           MR. GIBBS:  Right, and I think I would -- you

10  know, would try to stress, I think the seriousness of

11  that offense certainly warrants what the presentence

12  report indicates, which is that he got two criminal

13  history points for that one.

14          Each of the marijuana convictions got one

15  point.  And there was one point for the embezzlement

16  which Ms. Ginsberg spoke about a moment ago.  So it gives

17  the criminal history score of five and it's difficult to

18  see where, you know, any of those points were

19  inappropriately applied as to this defendant.

20          So, we would simply disagree.  We think the

21  probation officer scored it correctly.  We think the

22  offenses justify that scoring, and therefore there's no

23  basis for finding that the criminal history category is

24  overrepresented in this case.

25          THE COURT:  All right.

1          MR. GIBBS:  Thank you, Judge.

2          MS. GINSBERG:  Judge, if I could just make

3    one other point on that.

4          THE COURT:  Sure.

5          MS. GINSBERG:  Mr. Wehelie reminds me that

6    the marijuana possession, the second one when he did not

7    appear, he was overseas at the time.  So, he -- he was

8    taken overseas by his family.  They determined it was

9    better for --

10         THE COURT:  For him to miss court?

11         MS. GINSBERG:  He missed court, Your Honor.

12         THE COURT:  Okay.

13         MS. GINSBERG:  I think it does make some

14   difference that he was -- he was out of the country at

15   the time.

16         THE COURT:  All right, thank you.

17         Let the record reflect this matter is before

18   the Court for sentencing.  The probation officer has

19   properly prepared the report.

20         The defense has filed a motion asking the

21   Court to consider whether or not defendant's criminal

22   history category is overstated where he's listed in

23   criminal history category 3.  And the legal question is

24   whether or not the criminal history overrepresents the

25   seriousness of his prior criminal record or the risk of

1    recidivism.

2                I note that the defendant has two

3    convictions.   One was a deferred prosecution when he was

4    18 years old in March of 2009.   And, the second guilty in

5    absentia in August of the same year, 2009, age 18, and

6    both of these were misdemeanor offenses for which he did

7    not receive incarceration.

8                And then there is an embezzlement offense at

9    age 23 involving his theft from the store he was working

10   at the time, Dick's Sporting Goods where he received a

11   sentence -- an active sentence of 6 months and an order

12   to serve that.

13               And the other conviction is one of statutory

14   burglary for which he received two criminal history

15   category points and was given 3 years incarceration, all

16   suspended on 2 years.

17               As I reviewed this criminal history category

18   along with the *United States versus Nelson*, I think that

19   the legal question is whether or not looking at these

20   convictions whether or not they overstate his criminal

21   history category.

22               And I would think that the misdemeanor

23   offenses, possession of marijuana, when added in with the

24   offense involving embezzlement, also a misdemeanor, I

25   think overstate the criminal history category here in a

1   way that represents the seriousness of his prior criminal

2   record.

3           Typically offenders in criminal history

4   category 3 might have some offense involving weapons or

5   they might have some offense involving drug distribution,

6   and this defendant does not have that.

7           And the Sentencing Guidelines state that

8   overrepresentation of criminal history category is an

9   area where the Court has discretion and must look at that

10  carefully because criminal history category can often be

11  overstated.

12          So in this case I'll grant the motion for

13  lateral departure from criminal history category 3 to

14  criminal history category 2.   The offense level remains

15  the same, which is 19.   And I believe then the criminal

16  history -- the applicable guideline range would then be

17  33 to 41 months.

18          I want to address Ms. Ginsberg's objection to

19  the report and I said paragraph 46, but that may not be

20  the right --

21          MS. GINSBERG:   Your Honor, it's paragraph 47.

22          THE COURT:   Paragraph 47 and then also my

23  notice of intent to consider upward departure.

24          Ms. Ginsberg, context matters to me in this

25  issue.   Context matters.

1    MS. GINSBERG:   Thank you, Your Honor.   I
2    think first I'd like to address the context of the actual
3    offense conduct which was the distribution -- the
4    agreement to transmit -- transport these firearms.
5    And I think Mr. Wehelie's initial involvement
6    with this offense was the result of his interactions with
7    an individual who -- with whom he had -- for whom he had
8    been illegally transporting cigarettes.
9    I think the Court has -- I'm certain has read
10   all of the filings.   Mr. Wehelie was in, I would guess
11   the best way to describe it is dire emotional
12   circumstances as a result of what was really a tragic and
13   violent assault on his person that has had --
14   THE COURT:   In 2010?
15   MS. GINSBERG:   In 2010.
16   THE COURT:   But this offense occurred in
17   2016; is that right?
18   MS. GINSBERG:   That's right.
19   THE COURT:   Okay.
20   MS. GINSBERG:   And Your Honor, I think that
21   if Your Honor credits Dr. Stejskal's report, there is
22   every reason to believe that the trauma of that offense
23   carried forward and, in fact, he is still suffering from
24   the trauma of that assault.
25   I think that that is -- that conclusion was

1   borne out by the -- Ms. Lazaro who was the case manager

2   or person in charge of the program at the jail that he

3   participated in, which was an intensive treatment program

4   that was mainly directed at treating his substance abuse

5   problems but certainly did address the mental health --

6   very complex mental health issues as -- not only in

7   themselves but as they related to his substance abuse as

8   best they could in that setting.

9          But, it is absolutely clear to -- at least to

10  me, that from the time he returned from Egypt, he was

11  seen by everyone who knew him as an entirely different

12  person.

13         The letters from his family who saw him

14  firsthand and probably had the most interactions with

15  him, I think, are consistent in describing him as

16  emotionally depleted.  His mother talked about finding

17  him curled up on the floor crying, exhibiting -- just

18  outbursts of anger, emotional detachment.  He withdrew

19  from college.  He was unable to hold a job.  And his

20  emotional range -- his ranges of emotions was just all

21  over the place.

22         And clearly, according to Dr. Stejskal

23  consistent with someone who was suffering from severe

24  traumatic post distress disorder.

25         So it is in that -- he was unemployed, unable

1    to find or keep a job, partially because of his criminal

2    record and partially because of his own emotional

3    instability.

4         But he was basically medicating himself with

5    an array of drugs that he was doing whatever he could to

6    get his hands on.  And so he was selling or transporting

7    untaxed cigarettes and getting a few hundred dollars from

8    that here and there.  And it was the person he was doing

9    that for that said you can make some more money if you

10   will agree to transport firearms.

11        And, the individual involved in this was

12   Muslim.  And at that time, in Mr. Wehelie's life, a

13   religious and righteous Muslim individual was someone who

14   had a great deal of emotional appeal to him.

15        So, he agreed -- and I don't say any of this

16   as a way of minimizing the seriousness of the conduct.

17   It certainly -- these types of firearms --

18        THE COURT:  So he moved from cigarettes to

19   transporting high-powered weapons with magazines from

20   Baltimore to Virginia.  And what was he told the reason

21   these weapons were being moved?

22        MS. GINSBERG:  He wasn't told.  He wasn't

23   told.

24        But, Your Honor, the government conceded as

25   early as the detention hearing in this case that the --

1    the gun offense, the transportation of firearms had

2    absolutely nothing to do with terrorism.  It had -- it

3    was -- there was never any suggestion at the time that he

4    did this that there was -- that these guns would be used

5    for anything that would remotely be connected to a

6    terrorism offense.

7                THE COURT:  That may well be.  But my

8    experience has been that people don't go hunting with

9    AK-47s and military-style weapons.

10                MS. GINSBERG:  Judge, there is nothing good

11    about transporting those type of weapons.  There is no

12    question about that.

13                And, one can only imagine what they might

14    have been used for.  But I agree with Your Honor, there

15    could not be a good purpose for that.

16                What I think is extremely important is what

17    Your Honor mentioned at the outset is context.  I think

18    Mr. Wehelie's ability, his mental ability to draw

19    reasonable conclusions and moral conclusions about the

20    propriety of engaging in this kind of conduct was -- was

21    impaired to a degree that permitted him to move from

22    transporting cigarettes to transporting these very

23    dangerous guns.

24                And, I think one of the indications of that,

25    an indication that he really was not --

1          THE COURT:  Let me be clear, I think that

2    Virginia is known as a state where citizens have as many

3    weapons as they want.   The problem that the defendant has

4    is, as a convicted felon, he may not have weapons.

5          And so, the -- we're not talking about a

6    young man who is stopped by the police carrying a single

7    pistol.  We're talking about a person being paid to

8    transport high-powered weapons from one state to another

9    and then you have to, from the standpoint of context,

10   address the statements in paragraph 47.

11         MS. GINSBERG:  Okay.  I'm going to do that.

12         First, the statements in paragraph 47

13   occurred after he had -- the offense was complete.  There

14   were no other -- there's no suggestion that he was -- had

15   transported or was even asked to transport these weapons

16   again or that he might have agreed to do that had he been

17   asked.

18         But, the statements occurred after the --

19   I've been calling him the UCE, had been suggested --

20   encouraging his -- encouraging his devotion to religion.

21   This was something that I think in his state of -- his

22   emotional state --

23         THE COURT:  Let me say out loud.  I have -- I

24   have not been persuaded that the religion that I know of

25   as Islam promotes killing innocent people or is a

1   religion that is filled with violence.  I'm not familiar
2   with that.
3            So, I have difficulty just saying that
4   because of Islam he was led to talk about ISIL.  I have
5   trouble with that.  I don't know that to be the Islam I'm
6   familiar with.
7            MS. GINSBERG:  Well, I think it's not the
8   Islam that most of us is familiar with.  But this
9   occurred -- first of all, these statements, they were
10  not -- they were not as the government said, made over an
11  extended period of time.  These statements occurred on
12  one day in a long meeting with the UCE in a hotel room.
13           Now, that's not to say that he hadn't thought
14  about these -- these issues.  He came to the meeting with
15  some videos that he had seen on Instagram.  His
16  involvement with all of this Isis propaganda is based --
17  came from following -- people he was following on
18  Instagram.  This was a confused --
19           THE COURT:  People that the defendant was
20  following on Instagram?
21           MS. GINSBERG:  Several people that he was
22  following.  But, Your Honor --
23           THE COURT:  He has a right to do that.
24           MS. GINSBERG:  He has a right to do that.
25           THE COURT:  But, I have difficulty with the

1    statements that were made and the context.

2            And correct me if I'm wrong and help me with

3    the context.  As I understand it, this was a meeting post

4    offense where the defendant still had an outstanding

5    request from this individual who had given -- who he had

6    transported high-powered weapons for, to obtain weapons

7    for himself and his cousin that was a part of what was

8    still outstanding, and that they watched a movie or a

9    video about ISIL.  And then after that, there was a

10   discussion about him going overseas to join ISIL, and if

11   he couldn't go overseas to join ISIL -- I have the words

12   here.  I can read them out loud as you can.  They are --

13   they don't sound to me like the statements of somebody

14   that was high on drugs.  And they don't sound like the

15   statements to me that were the product of some

16   spontaneous -- it was the product of some kind of thought

17   process that was not -- "I would say I would like to go

18   like to recruitment centers".  That's the defendant

19   speaking.

20           "Why recruitment centers", the undercover

21   says.

22           The defendant, "There's a bunch of soldiers

23   there".

24           "Why there instead of some other place?", the

25   UCE says.

1      The defendant, "Cause I think there will be

2  less security and more damage I can do.  If I want to do

3  that, I want to do a lot of damage.  I don't want to get

4  one guy.  I want to get like 20 of them or something like

5  that, you know.  Nothing is impossible".

6      "It's very difficult."

7      "Other than that, any shopping center, you

8  know, just catch those niggers just sitting there, you

9  know, in Springfield.  You see them chilling there and

10 say hey, what's up.  Come there one day, come in one day,

11 act like I'm cool.  Sign up, like, you know, show my

12 face, you know, sign up.  They're like okay.  Next time

13 they see me open arms.  Next time, I just don't know,

14 like nothing is gone.  It's the whole spot gone".

15 UCE, "Empty a clip?"

16     Defendant, "Just empty the clip.  Everyone at

17 me."

18     "Which recruitment center?  Army, Navy,

19 Airforce, Navy, where?", UC.

20     "Anyone.  Especially I love to catch Marines.

21 I hate those guys."

22     UC, "Why Marines?"

23     Defendant, "Cause I think they're so tough.

24 They think they're so bad.  You know, they think they're

25 number one.  That's the number one so-called bad ass,

1   right, like the toughest American from all those guys are
2   the Marines."
3             MS. GINSBERG:   Judge --
4             THE COURT:   That doesn't sound like something
5   that happened just that day.   That had been something
6   that had been ruminating around in his mind for a long
7   time.
8             MS. GINSBERG:   Judge, first of all, the
9   question of whether he was high or not, he was high every
10  day.   He was high every day.
11            THE COURT:   You and I have handled hundreds,
12  thousands of cases involving people who get high.   Never
13  once have I had someone get high and say, you know what
14  I'm going to do?  I'd go overseas and get guns.   I'd go
15  to Springfield or some place and kill Marines.   I've
16  never heard that before, ever.
17            As a human being, I'm a 65 years old.   I've
18  been doing this 40 years, and you've been doing this
19  equal amount of time.   We've never had a case like that,
20  never.
21            MS. GINSBERG:   Judge, I understand what
22  you're saying, but I have also heard young children, 10,
23  11, 12 years old, after watching some of the video games
24  that are as violent as anything you can imagine say
25  comments, that although not in the context of Isis are

1    not any different than that.

2            And I think Your Honor can't disagree with me

3    that you have heard children, after they play these

4    violent games after they do -- they are encouraged by

5    their friends.  They talk about what they're going to do

6    about blowing people up, how they can't wait to get their

7    hands on this and get to there and they came up with the

8    most elaborate of schemes.  These are 10, 11, 15 years

9    old.

10            THE COURT:  We're talking about a person who

11    attended college for more than a year and who was 23,

12    24 years old and who had come back from Yemen and Egypt

13    four years earlier and who was following Instagram ISIL.

14            I understand what you're saying, and I

15    received Mr. Wehelie's letter.  I'm just having real

16    difficulty erasing those words I just read out of my

17    mind.

18            And I have to be clear that obviously the

19    Sentencing Guidelines are advisory here and I gave you

20    notice that I'm considering an upward departure, not just

21    because of the statements, but because of the context.

22    The context matters to me.

23            Transporting high-powered weapons, then

24    having a conversation with the person supplying

25    high-powered weapons and going beyond that and saying,

1    not just get me a weapon.   Let me tell you what I'm going
2    to do with the weapon.
3            MS. GINSBERG:   Judge, let me just say this.
4    The request to get a gun, Mr. Wehelie's request to get a
5    gun occurred months before -- I think at or before the
6    time that he transported the weapons.
7            He never followed up on that.   These were
8    clearly, clearly people who had access to firearms.
9    Mr. Wehelie made one request -- made one request saying
10   that he would like -- asking can he help him get a
11   firearm.
12           THE COURT:   Can you point me in this record
13   to any statement he's made where he withdrew what I just
14   said?
15           MS. GINSBERG:   Well, Your Honor, yes.   I can
16   tell you in his text to the undercover, the UCE, he says
17   on April the 3rd, which is about 2 or 3 weeks later, he
18   says, "I'm starting to have doubts.   Isis, bro, they been
19   doing a lot of bad and killing innocent people.   So, I'm
20   confused now, bro, like if they really on the truth.   I
21   don't know, bro.   I'm just confused.   It's all problems.
22   But it's the problems over there.   I don't know which
23   team to be on.   Maybe I'm wrong.   I need to start praying
24   and getting close to Allah.   I just love the fact that
25   they were trying to make a Muslim state.   I thought I was

1   sure, but I just took a step back and looked at those --
2   at the facts."
3            And then he breaks off contact with the
4   undercover.
5            THE COURT:  I read that, too, but I didn't
6   say where he withdrew the threat.  Did you?
7            MS. GINSBERG:  Judge, he didn't -- he
8   didn't -- he didn't --
9            THE COURT:  Even in the statement he wrote to
10  me, he doesn't say I withdraw those words.
11           MS. GINSBERG:  Well, Your Honor, I think he
12  did in so many -- I mean, if Your Honor is looking for
13  that -- those specific --
14           THE COURT:  I would expect someone facing
15  sentencing would say, absolutely, that those statements
16  are false.  I withdraw them and I disavow them.  I expect
17  that.
18           MS. GINSBERG:  I think he did.
19           THE COURT:  Okay.
20           MS. GINSBERG:  I think he did.  He certainly
21  has in ever conversation I've ever had with him.
22           THE COURT:  I don't doubt that.  I don't
23  doubt that he's told his lawyer that.
24           MS. GINSBERG:  Well, Your Honor, I -- if Your
25  Honor -- if Your Honor -- and I -- if Your Honor puts any

1    faith in my judgment about people, I will tell you that I
2    think that the statements he have made -- has made have
3    been genuine, heartfelt and are a true representation of
4    his --
5         THE COURT:  I don't doubt your integrity, and
6    your integrity is not in issue.  This is your client, not
7    your cousin.
8         MS. GINSBERG:  Your Honor, Mr. Wehelie was
9    under surveillance as -- these were obviously alarming
10   comments.  I cannot imagine that the United States did
11   not employ every means of surveillance available to it,
12   including the use of FISA intercepts.
13        They knew when he was going to get on a plane
14   to Minnesota.  They knew he'd traveled to Ohio.  They
15   showed up at his house.  They knew the cars that were
16   coming to his house.  They knew who he was coming and
17   going with.  They knew the places he was going.  And they
18   found no indication whatsoever of any conduct that would
19   be supportive of any of those comments.
20        And, the government arrested him and tried --
21   and says, well, we couldn't have ignored the fact that he
22   might have left the country.  No one is disputing the
23   fact that it was a prudent thing to arrest him.
24        But they found no indication that he planned
25   to leave the country.  They knew exactly what he was

1    doing.  They knew who he was talking to.  And they know
2    that nothing of any substance came up as a result of
3    their surveillance of him.  And had there been, we would
4    be facing very, very different -- we would be in a very,
5    very different position today.
6              And I think regardless of the words he used,
7    his conduct, what -- this Court -- what should be
8    important to this Court is what he did, not what he said.
9              THE COURT:  I appreciate what you just said.
10   Thank you.
11             MS. GINSBERG:  Thank you, Your Honor.  And,
12   Your Honor, I -- in -- how you explain how a person who
13   is otherwise so obviously as considered by his family and
14   the people that know him, who is so obviously a loving,
15   caring, nonviolent individual could arrive at a point
16   where he was uttering such chilling words, there has to
17   be an explanation for that.  He did not have a history of
18   being involved or even being interested in the slightest
19   degree in organizations like Isis.  He didn't do anything
20   ever.  He didn't -- when the undercover agent suggested
21   that they send blankets overseas, he didn't say, oh,
22   yeah, I'll get you some blankets.  He didn't do anything
23   to back up any of these words.
24             Now, I can't argue with you.  It sounds like
25   an elaborate thought process.  I don't know how he came

1   to say those things.  But, what I do know is that his
2   behavior, his conduct which was under close examination
3   by the government as well it should have been, didn't
4   turn up anything that was consistent with the threats
5   that he expressed.

6           And so, why he came to -- how that happened?
7   Why he -- I'm sure -- he is anxious to address the Court.
8   I'm sure you're going to ask him.  How did this happen?
9   How did you say these things?  Where did it come from?
10  They obviously sound well thought out.

11          But, I don't know what goes on in the mind of
12  someone who has been through the years -- at this point,
13  this was five years of emotional dissolution and how he
14  comes to that point.  And if he -- and it sounds like he
15  did.  He briefly flirted with some of the ideas that Isis
16  was putting out to the world.  But, he didn't do anything
17  about it.  And he didn't follow up with the people who
18  could have gotten him firearms.  He didn't follow up with
19  these individuals who could have put him in contact with
20  anybody that could put him on a boat to go overseas.  He
21  hid from them.

22          He stopped answering their calls, their
23  texts.  He hid from them.  And the government kept their
24  eye on him.  I have to assume, and I'm sure the Court
25  would expect, that they kept a very, very close eye on

1  him.  And they found nothing.  They found absolute --
2  they found that he did absolutely nothing.
3  And if they -- they had access to his phone
4  after he was arrested.  I -- I would expect they had
5  access to his phone beforehand or at least who the people
6  he was calling.  They would have seen from his text
7  messages he was going to Minnesota to stay with his aunt.
8  He was making arrangements to get together with young
9  women.  That's not the kind of conduct someone who is
10  planning an escape from the United States and go overseas
11  and commit some kind of violent act.
12  This was a desperate young man who was
13  falling apart, whose family relationships had totally
14  disintegrated, who was ashamed because he could barely
15  look his family in the eyes.  And you can see from the
16  letters they wrote, what kind of amazing people they are.
17  THE COURT:  Thank you, Ms. Ginsberg.
18  MS. GINSBERG:  Thank you, Your Honor.
19  THE COURT:  Let me hear from the government.
20  MR. GIBBS:  Thank you, Judge.
21  Judge, to your point about the context, I
22  think Your Honor obviously has read through the pleadings
23  very carefully and is familiar with the undercover call.
24  And I think the government shares the concern about those
25  statements.  And I think in terms of that context, it's

1    important to point out as the Court noted, the defendant
2    did make statements to the undercover about getting his
3    own gun and this was earlier.  This was in January and
4    February of 2016.
5            February 18th of that same year was the date
6    of the offense.  So, that's the date that the defendant
7    was agreeable to, for $300, transporting these four
8    high-powered weapons from Maryland to Virginia.
9            So, the offense occurred and the defendant
10   willingly joined it, participated in it, transported the
11   guns, turned them over to another individual in Virginia
12   but then stayed in touch with the undercover.  And there
13   were communications with them.  A number of them were
14   recorded.  One of them was attached to our pleading where
15   he makes this -- these comments on March 30th.
16           Now, as Ms. Ginsberg already pointed out, the
17   defendant, you know, had this interest in Isis.  He
18   looked at them on Instagram.  Apparently there was
19   something very appealing about this group, about their
20   ideology, what they portrayed in the media and the
21   violence that they espoused.
22           And I think one of the things that is
23   especially troubling about the March 30th communication
24   with the undercover is, as you read through the
25   communication, the undercover is not sort of pushing

1  Mr. Wehelie in any particular direction.  He's asking
2  questions.

3       And the UC asked about what would you do if
4  you weren't -- in the context of joining Isis, what would
5  you do if you were not allowed to travel and you couldn't
6  go overseas to joint Isis?  And that's the point at which
7  Mr. Wehelie comes up with this very detailed, thorough,
8  chilling plan about what he would do.  And the Court read
9  some of that into the record.

10      And it's -- it's a bit hard to believe that
11  this is an individual who was high and had smoked
12  marijuana, and yet he's sitting there having these
13  conversations and sort of laying out in great detail what
14  it is he would do if he were prevented from traveling.

15      So, I think we agree with the Court that
16  these are incredibly troubling statements and certainly
17  give the government pause.  And I don't think it's fair
18  as Ms. Ginsberg suggested to say that, oh, well, the
19  government has lots of resources.  They clearly were
20  concerned about this guy because of these statements and
21  other things, and so, they would have had all the
22  surveillance and it's okay.  Everybody was safe.  We
23  don't have to worry about that.

24      THE COURT:  The defense says that the
25  government agreed that there should be no enhancement for

1    factors involving terrorism; is that right?

2              MR. GIBBS:  It is correct, Judge, and that is

3    right.  I mean, we would argue that the terrorism

4    enhancement doesn't apply in this case, because again it

5    has to apply in terms of the offense of conviction.  And

6    we don't argue that the defendant should get bumped up to

7    a criminal history category 6 and up to level 32 based on

8    that.  I mean --

9              THE COURT:  Well, I kind of had the

10   impression that that was a judgment that you all reached.

11   But that did not mean that I could not consider the

12   conduct that occurred during the investigation post

13   offense.  And this appeared to me to be post offense

14   conduct that was still during the investigation.  And the

15   question I have -- the legal question I have, is it

16   relevant conduct?

17             MR. GIBBS:  Judge, we believe it is, and I

18   think we believe that this is part of the, you know, in

19   terms of the context of the offense, this occurred about

20   six weeks after the crime itself was committed, but it

21   occurred in the context of continued discussions with

22   this same undercover employee.  They had still stayed in

23   touch.  They were still getting together.  They were

24   still -- nothing had happened.

25             And again, I think there was a discussion

1  earlier about whether the defendant had withdrawn from

2  any sort of criminal conduct or expressed his desire to

3  withdraw.   That didn't happen.

4           So, from the time that the guns were

5  transported up to the time of the March 30th statements,

6  the defendant continued to stay in touch with the UCE,

7  continued to talk to him, continued to talk to him about

8  these troubling comments.   And so, we would argue that

9  these are facts that the Court should have the ability to

10  consider in fashioning an appropriate sentence in this

11  case.

12           THE COURT:   So, the context issue is one that

13  I want you to address as well.

14           The person he was talking to had the capacity

15  to provide weapons.   He knew that because the person

16  actually hired him to move weapons.

17           MR. GIBBS:   Correct.

18           THE COURT:   So, the context of discussion is

19  post offense, but it has to do with weapons, that is to

20  say how weapons would be used if he could not leave the

21  country and what he would do with them.

22           MR. GIBBS:   That's right, Judge.   And,

23  interestingly, in the discussions he had with the

24  undercover, I don't believe -- and Special Agent Gaylord

25  is here.   I'm sure he can correct me if I get this wrong,

1    but I don't believe there was any discussion of the

2    defendant saying, yeah, this is a great plan.  I really

3    thought it through, but my one problem is I can't get

4    weapons.  I mean, I don't think he expressed sort of,

5    that that would be a big hindrance in terms of this.

6              And he never expressed it in terms of, you

7    know, I'll do this with a knife or I'll do this with a

8    sword.  He talked about getting a gun and spraying the

9    entire clip.  So --

10             THE COURT:  What effect, if any, should I

11   give the statements Ms. Ginsberg read in the text

12   messages about having doubt?

13             MR. GIBBS:  Well, I think later there were

14   some doubts expressed.  And as the -- as the

15   investigation continued, I think from what we could tell,

16   Mr. Wehelie did withdraw.  Seemingly he had had

17   discussions with other individuals and it appeared that

18   he began to have suspicions towards the undercover, that

19   he might be a government agent which as it turned out was

20   accurate.

21             THE COURT:  So, you think that the statements

22   in context about having doubts were after he had an

23   impression the person he was talking to was an undercover

24   agent?

25             MR. GIBBS:  That's correct.  And at the time

1   of the statements on March 30th, Mr. Wehelie appeared not

2   to have any doubts.  He appeared very trusting of the

3   undercover and appeared to feel as though he could talk

4   about his affinity for Isis openly and freely with that

5   individual.

6           THE COURT:  All right.  Well, talking about

7   Isis is not the same thing as having a plan to do

8   something for Isis, is it?

9           MR. GIBBS:  No, not at all, Judge.

10          THE COURT:  Okay.

11          MR. GIBBS:  Thank you, Judge.

12          MS. GINSBERG:  Your Honor, if I might, first

13  of all, it's not necessary to withdraw from a -- assuming

14  there was a plan which I don't concede for the first

15  instance, but someone can withdraw from criminal conduct

16  or anticipated criminal conduct without announcing to the

17  people that they had been talking to that I am

18  withdrawing.  They just stop.

19          And, that's a -- that's something courts

20  consider all the time.  You don't have to actually use

21  the -- you have to remove yourself, but you don't have to

22  say, hey, so and so, I'm withdrawing from this.

23          And, I think his conduct is evidence that

24  that's exactly what he did.  And I will tell the Court

25  part of the reasons that this case has been -- the

1    sentencing has been continued so many times is because I

2    have requested discovery, some of which has been

3    produced, some of which hasn't for reasons perhaps of

4    national security.

5            But I have requested any -- the government

6    produced anything that suggests that this was -- that

7    there was anything relevant to this discussion that we're

8    having right now.  And I can tell you that I received

9    absolutely no evidence, nothing from the government that

10    indicated that there was a basis for Mr. Gibbs's

11    statement that he may have suspected that this was an

12    undercover agent.

13            And if that's existed, that's something that

14    should have been disclosed, and I don't believe it.  I

15    don't -- I don't believe that Mr. Wehelie had the

16    slightest inclination that this -- that the person he was

17    talking to was an undercover agent.  And I think if the

18    Court is even going to consider that, the government has

19    an obligation to make the basis of that known to the

20    Court and to me.

21            THE COURT:  All right.

22            MS. GINSBERG:  But, aside from that, when

23    Mr. Wehelie agreed to transport these firearms, he didn't

24    know what kind of firearms they were talking about.  He

25    got to this hotel.  He got -- he got to the hotel room

1    late.   I mean, that's how excited he was about

2    transporting firearms.   He was supposed to be there early

3    in the morning.   He didn't arrive there until sometime in

4    the afternoon.   They'd been trying to reach him.   He

5    didn't hear the phone because he was passed out from

6    having been up and using drugs the night before.   That's

7    the state of mind he was in when he went to pick up these

8    firearms.

9            He also -- the government also has no -- can

10   say he didn't -- he didn't say well, I would do this but

11   I can't do it because I don't have guns.   They know that

12   he didn't ever make a second request for the undercover

13   agent or anybody associated with him to get him guns.

14   And they offered to sell him other types of weapons.   He

15   didn't -- he didn't follow up on any of that.   And they

16   have no reason based on their surveillance to think that

17   he had any way of ever finding firearms.

18           So, I think that the -- as horrific as these

19   statements were, what really matters is what he did and

20   actually what he didn't do.   And that when Your Honor

21   asked for context, that is the most -- you can't get into

22   someone's head.   You or I will never really know what

23   inspired those comments, as troubling as they were.

24           But what we do know is what he did not do.

25   He did not attempt to obtain a firearm or any kind of

1    weapon from these individuals or anybody else.  He took

2    no actions that were consistent with the statements he

3    made.  He was a -- what I would call a very damaged

4    individual who was in excruciating emotional pain, and he

5    made what are obviously more than regrettable comments,

6    but this Court can't point to any objective evidence that

7    he ever intended to carry them out.

8              And that's really what -- the crux of this.

9    They're troubling words, but we don't put people in jail

10   for their words.

11             THE COURT:  Thank you, Ms. Ginsberg.

12             MS. GINSBERG:  Thank you, Your Honor.

13             THE COURT:  The record should reflect that

14   I've considered the -- whether to sustain defense

15   objections to removal of the comments in offense behavior

16   not part of the relevant conduct in paragraph 47 that

17   I've described on the record.  I'm going to overrule the

18   objection.  I will leave the statements in.

19             I have decided from the standpoint of

20   procedural sentencing issues that the guidelines will

21   remain as I announced earlier granting the defendant's

22   motion for downward departure from 33 to 41 months.  And

23   I will consider those comments as it relates to 3553(a)

24   what judgment I make about sentencing.

25             So to be clear, the guidelines are

1    procedurally correct as I've just announced.  I'll leave

2    the information in and I am going to consider them as it

3    relates to what I do in the 3553(a) for sentencing.

4         Does the government have anything you want to

5    say about sentencing, 3553(a)?

6         MR. GIBBS:  Judge, just very briefly, I think

7    most of this was covered in our moving papers.  You know,

8    the offense itself of moving the guns, we believe that

9    the guidelines as currently calculated accurately reflect

10   that offense, the 33 to 41 months.  But, again, that

11   offense was committed in the context of these additional

12   discussions with the undercover employee from March 30th.

13   And those statements were obviously incredibly troubling

14   to the government, to the FBI.

15        It was really those -- because, again, those

16   statements were made in the context of a question about

17   what would you do if you were prevented from traveling

18   over there.  He made the comments about attacking a

19   Marine Corps recruiting station and spraying the clip.

20        And so, it was in July of 2016 when the

21   defendant first tried to travel.  He was going to

22   Minnesota.  The FBI just couldn't be certain that that

23   wasn't an attempt to get close to the Canadian border and

24   travel across.  So he was arrested immediately upon that,

25   because in his own comments, there was a trigger.  It was

1    "if, then".  If I can't travel, then I will go commit

2    this crime.

3              And, as troubling as they were, and given the

4    closest in time and the fact that it was still with the

5    same undercover, we would argue that those are facts that

6    should be taken into consideration by Your Honor in

7    fashioning an appropriate sentence under the 3553(a)

8    factors.  So --

9              THE COURT:  If someone threatens to kill the

10   President of the United States, and they're here and the

11   President of the United States is in Paris, is that a

12   criminal offense?

13             MR. GIBBS:  I believe it is, yes, Your Honor.

14             THE COURT:  Is there any First Amendment

15   right to threaten to kill the President of the United

16   States and not have any present ability to carry it out?

17             MR. GIBBS:  Your Honor, it's been a long time

18   since I've done any of those cases --

19             THE COURT:  Let me put it this way.  Could

20   someone sitting in Alexandria threaten to kill the

21   President of the United States knowing he's in Paris, and

22   not have any weapons?  If it is determined to be a true

23   threat, could that person be prosecuted in federal court?

24             MR. GIBBS:  I believe they could, Judge.

25             THE COURT:  All right.  Thank you.

1          MR. GIBBS:  Thank you, Judge.

2          MS. GINSBERG:  Judge, I have to say that I

3    am -- to say disturbed is to --

4          THE COURT:  You have a tough job here.  I

5    understand that.  But make your statement.

6          MS. GINSBERG:  Your Honor, first of all, I

7    think it is entirely disingenuous and inappropriate for

8    the government to make the statement it just did in terms

9    of what it believes is an appropriate sentence.

10         And, I say that because when the government

11   filed its initial sentencing pleading, it took into

12   account every single thing that we've been talking about

13   here and made reference to these comments, made reference

14   to the seriousness of these comments.

15         Your Honor knows that these sentencing

16   recommendations are not the idle recommendation of a

17   single prosecutor but are vetted and well thought out,

18   especially in this context.

19         And the pleading, the initial pleading that

20   the government filed in this case said that it believed

21   that a sentence within the guidelines was an appropriate

22   sentence.

23         And, to then come to this court after Your

24   Honor files a notice of intent for a possible upward

25   departure and essentially change its considered view of

1  what an appropriate sentence is because the Court

2  indicated that it might impose a harsher sentence, to me

3  is a -- an incredibly disturbing thing to have happen.

4           And it shakes my confidence.  And I think it

5  will shake the confidence of other defense counsel in its

6  ability to rely on representations that the government

7  makes.  And I think it should disturb the Court that it

8  can represent what it believes is its considered judgment

9  and then when it thinks it has an end, to stick it in a

10  little harder, to come back and disavow what was

11  obviously a considered judgment at the outset.  And I

12  find that extremely offensive, and I'm very disturbed by

13  it.

14           Notwithstanding that, I'm not going to -- I

15  don't think it's necessary to repeat the information

16  that's in Dr. Stejskal's report.  Your Honor has his CV.

17  He is clearly an extremely qualified professional and

18  extremely qualified to make the assessments that he did.

19           This is an individual who was suffering from

20  the symptoms of severe PTSD which Dr. Stejskal and

21  Ms. Lazaro both believe he is continuing to suffer today.

22           And he is sitting here.  He wrote you a very

23  articulate letter.  You will hear him speak.  He does not

24  look like someone who is in extreme distress.  But, Your

25  Honor, this is an individual who suffered a horrific,

1   violent assault on his person that affected his very

2   core.   And he drowned himself in drugs and probably

3   became like any other alcoholic who looks normal when

4   he's high as a kite because he was in extreme pain.

5           Dr. Stejskal says he is still experiencing --

6   and I think that the jail -- the jail had -- is in

7   agreement with this.   He did extraordinary -- he made

8   extraordinary efforts to get whatever treatment was

9   available to him while he was at the jail.   Everybody --

10  there's no question he benefitted in an extraordinary way

11  from this.

12          Confronting -- confronting these issues in a

13  jail and having to process and cope and maintain in a

14  jail is something that is probable more difficult in a

15  psychological sense that most people ever have to deal

16  with.

17          This -- this is the sign of someone with

18  character, with integrity, someone I think that the Court

19  can rely on when he said this is not what I ever intended

20  to do.   And this is what I will never do -- never say or

21  ever do in my lifetime again.

22          And I think every indication that the Court

23  has is that this is an individual who was at a breaking

24  point five years later, is still today.

25          Dr. Stejskal says it is important where he

1  goes to prison, that the -- that the people who are going

2  to be taking care of him are aware that he could, I

3  forget the term he used, but that he could fall into a

4  severe emotional state if -- if he's not in a proper

5  setting.

6          So, the fact that he has been able to do well

7  in the jail, that he's completed programs that he's --

8  what appears to be a thoughtful and articulate individual

9  does not mean that he was not gravely affected by what

10 happened to him.

11         And frankly, to me, that is the best

12 explanation for those words from someone who was never --

13 never would have been expected to behave that way before

14 and who's given every indication since that he will

15 never, ever be involved in anything like that again.

16         THE COURT:  All right.  Mr. Wehelie, if you'd

17 come to the podium with your lawyer, please.

18         Good morning.

19         MR. WEHELIE:  Good morning, sir.  How you

20 doing?

21         THE COURT:  I'm fine.

22         Mr. Wehelie, is there any statement you want

23 to make on your behalf?  You've been listening to all

24 these discussions we've had.  What do you have to say?

25         MR. WEHELIE:  I would like to start out by

1  saying I take full responsibility for the actions and

2  crimes I committed.  And I also truly wholeheartedly

3  regret the statements I said and definitely disavow them

4  and discredit it.

5           And I don't -- I don't ever believe that

6  someone who is really a follower of Islam, who calls

7  himself a Muslim will ever commit violence in their

8  religion or anything like that.  That does not

9  representative Islam.  It does not represent my parents

10  who are the true example of Islam and the American dream.

11           They've come to this country with nothing and

12  they have everything now.  And they're the most peaceful

13  and the most humblest people that I know, and they always

14  support me and have my back.

15           And, when I do have an opportunity to go back

16  to society, I do plan on finishing my school.  And I want

17  to help people who have been in my situation, who have

18  been through what I've been through, who have been

19  through, like, what happened to me in Egypt.

20           I want to help because only someone who's

21  been in those shoes can really understand what a person

22  really goes through.  And, I really feel like this 1 year

23  and 1 week of incarceration has really changed my life

24  and I finally looked at myself in the mirror, and I

25  really see a different person.  I'm not the person -- I

1    didn't like myself before.   I hated myself for no reason.
2              I finally accepted -- I finally have
3    acceptance.   That's what I learned in the drug program.
4    That's the first thing I learned is acceptance.   I accept
5    that what happened to me is not going to define me.   And
6    after this, after this speed bump, I'm going to be
7    successful.   I'm going to be a person that people can
8    look back and say, wow, he's been through this and look
9    what he's -- look how -- he became a better person.   Look
10   he's successful, and he has a family.   And I have a lot
11   of plans, and I'm going to do that when I do get an
12   opportunity, Your Honor.
13             And, thank you for letting me speak today.
14             THE COURT:   All right.   Mr. Wehelie, you're
15   before the Court for possession of firearms by a
16   convicted felon.   And offenses involving weapons and a
17   person convicted of a felony in and of itself are serious
18   offenses.   But, your case is distinctive in several
19   respects.
20             First, you were just involved with untaxed
21   cigarettes and somehow became involved with this
22   individual who offered you the opportunity to transport
23   weapons for money.
24             And your lawyer has given me context that
25   says that you were using drugs and financially in dire

1    straits and not in school anymore.  You completed a year

2    of school and you stopped going to school.

3          And that offense involved transportation of

4    weapons that were powerful, high capacity magazines

5    weapons that are not weapons for hunting or target

6    shooting but very serious weapons that could only have a

7    nefarious criminal purpose if brought to the streets of

8    Virginia, which is what you did to bring them to

9    Virginia.

10          The offense in my mind also, from the

11    standpoint of context involves the events that preceded

12    it from the standpoint of your, as you described, what

13    occurred in Egypt, coming back to the United States and

14    then five years later or nearly five years later, this

15    involvement with this individual takes place.

16          You're following ISIL on Instagram and about

17    four weeks after the offense, there's this meeting with

18    the undercover, and the investigation continues at this

19    point.  And, you were watching ISIL video.  And you heard

20    me read what I read about what you said and what you

21    would do.

22          And I've been trying to think about that from

23    the context of sentencing you for the offense you

24    committed and taking into account all the conduct,

25    because a judge is not restricted in what they consider

1   at sentencing.  I have to consider the whole individual.

2            And, the person that your family described is

3   not the person who made those statements on that day.

4            The person who made those statements on that

5   day is someone who poses a threat to public safety at a

6   military recruiting center.  And the description of how

7   it would go -- take place is not just chilling, it was

8   something that would not be a spontaneous thought that

9   someone who was using drugs would have.

10           I've sentenced maybe thousands of people who

11  have been affected by drugs.  Not one has ever said I

12  want to kill Marines in the name of ISIL.  Not one has

13  said I want to commit mass murder or I'm even thinking

14  about it with the detail that you said.

15           And I would expect you to come here today and

16  say, well, Judge, I don't believe those things any more.

17  I disavow it.  I expect you to do that.  And I would

18  expect you to do that because you realize that you're in

19  federal court and federal courts have cases like this.

20           Now, I understand and I've taken into account

21  the fact that you were under surveillance for nearly a

22  year.  And the government had the opportunity to observe

23  what you did.  And there was nothing that rose to the

24  level that would bring you to criminal court.  And this

25  weapons offense was one of opportunity.  And it was

1    presented to you and you readily took it.

2            But when the discussion talked about -- after

3    ISIL -- watching the ISIL video what you would do, I've

4    tried to say to myself, well, can you walk those words

5    back and how do they fit in the context.  And the way

6    they fit in the context to me is the person you were

7    speaking with was not some random individual.  It was an

8    individual who you knew had the capacity to provide you

9    with high magazine, very serious weapons, because he had

10   already done it before a month earlier.

11           And while there's no evidence that you

12   visited a military recruiting station, I have grave

13   concerns about a young man even talking about such a

14   thing.  I have concerns that since you're willing to move

15   weapons in exchange for money, that had you had your own

16   weapons or were provided with your own weapons that you

17   might actually carry out such an act.

18           And I recognize the offense before the Court

19   is one of possession of weapons, and I've said that

20   several times.  And in weighing the offense and the

21   applicable guideline range, the guidelines cover in

22   their -- the Sentencing Commission has said the

23   guidelines cover the mainstream offense.  I don't

24   necessarily agree with that, because I don't think

25   there's any empirical evidence that shows that the

1  guidelines themselves have any relationship to what
2  punishment is appropriate in every single case.  One size
3  does not fit all.
4          As I evaluate your case, I'm convinced that
5  the guidelines are inadequate to take into account the
6  post offense conduct that demonstrates a mindset that is
7  one that we can only measure a person by their words and
8  their actions.
9          And, Ms. Ginsberg is right.  There are no
10 actions that I can point to where you obtained a weapon
11 or visited a military recruitment center.  But I can
12 certainly measure you by your words, and I will.
13         And I've considered the submissions in both
14 sides' briefs, and the arguments, the sincere arguments
15 made by counsel and your counsel, in particular.
16         I take you at your word.  Given you've travel
17 to Yemen, your statements made to the undercover officer,
18 I will not turn a blind eye to what a person says to
19 someone who has the capacity to provide weapons within
20 30 days of the offense.
21         My judgment is the Court may properly take
22 into account these statements made about what he would do
23 with weapons and his description of plan to commit an act
24 in the name of ISIL.
25         I have no First Amendment problem here as I

1    conclude the threats to commit violence against the

2    United States, the United States military recruiting

3    offices 4 weeks after handling high-powered weapons does

4    not protect First Amendment speech.

5              I acknowledge that the threat here is a

6    verbal one to undercover individual contemporaneous in

7    the sense that it's 4 weeks later to someone who had the

8    possibility of providing weapons. And it always is

9    impossible to predict a person's actions.

10             But the context here of 4 weeks earlier

11   having transported high-powered weapons, watching ISIL

12   video, discussing travel overseas to join ISIL and then

13   spontaneously describing a detailed plot to carry out

14   mass murder at a military recruiting station is not

15   something within the normal Sentencing Guidelines. They

16   could not take into account such an aggravating factor

17   and under 3553(a), they could not take into account such

18   a high aggravating factor.

19             And I do not find your statements to be

20   puffery. They were not a joke or idle chatter. And the

21   events, if carried out, would have certainly been

22   devastating.

23             I recognize that I could very easily sentence

24   you to a guideline sentence. However, I've determined

25   that a guideline sentence would be insufficient, under

1    3553(a), to take into account the nature of the offense

2    and the context of the offense.

3              My judgment is I'm going to sentence you to

4    120 months in the custody of the Bureau of Prisons.  I'm

5    going to place you on a 3-year term of supervised

6    release.  I recommend that you participate in the

7    500-hour residential drug treatment program.

8              I will make a special condition that you

9    participate in mental health treatment at the direction

10   of the probation officer and waive confidentiality as to

11   the mental health provider so the mental health provider

12   can speak to the probation officer.

13             I require you to participate in substance

14   abuse testing and treatment at the direction of the

15   probation officer.  I will recommend to the probation

16   office they -- I will recommend to the Bureau of Prisons

17   that you be allowed to participate in the 500-hour drug

18   treatment program.

19             Ms. Ginsberg, I was thinking FCI Butner,

20   North Carolina.  Do you have any other placement in mind?

21             MS. GINSBERG:  Your Honor, we were going to

22   recommend that or Fort Dix.

23             THE COURT:  FCI Fort Dix.

24             MS. GINSBERG:  Either Butner for Fort Dix.

25             THE COURT:  Okay.  I'll put in the

1    recommendation to the Bureau of Prisons FCI Fort Dix or

2    FCI Butner, North Carolina.

3              MS. GINSBERG:  Judge, if --

4              THE COURT:  I will not impose any fine, cost

5    of incarceration or cost of supervision because I make

6    the judgment you do not have the ability to pay those

7    things.  And the $100 special assessment has to be paid

8    right away.

9              Yes.

10             MS. GINSBERG:  I just want to point out that

11   I think it's a good idea for him to -- and I think he

12   would want to participate in the RDAP program.  But just

13   point out to the Court he will not get -- he will not be

14   eligible for sentence reduction as a result of that.

15             THE COURT:  I understand.  I would hope he

16   would want the program to get sober.

17             MS. GINSBERG:  Yes, sir.

18             THE COURT:  Thank you.  You all are excused.

19             (Proceeding concluded at 10:11 a.m.)

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3           I, Renecia Wilson, an official court

4    reporter for the United State District Court of Virginia,

5    Alexandria Division, do hereby certify that I reported by

6    machine shorthand, in my official capacity, the

7    proceedings had upon the sentencing hearing in the case

8    of United States of America vs. Yusuf A. Wehelie.

9           I further certify that I was authorized and

10   did report by stenotype the proceedings and evidence in

11   said sentencing hearing, and that the foregoing pages,

12   numbered 1 to 52, inclusive, constitute the official

13   transcript of said proceedings as taken from my shorthand

14   notes.

15           IN WITNESS WHEREOF, I have hereto subscribed

16   my name this 10th day of August, 2017.

17

18                        _____/s/_____
                           Renecia Wilson, RMR, CRR
19                         Official Court Reporter

20

21

22

23

24

25